IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FILED
JUN 3 0 2011
IN THIS OFFICE.
Clerk U. S. District Court
Greensboro, N. C.
By _____

BASF AGRO B.V., ARNHEM (NL), )
WADENSWIL BRANCH, et al. )
)
    Plaintiffs, )
)
    v. )    1:10CV274
)
CHEMINOVA, INC. )
)
    Defendant. )


BASF AGRO B.V., ARNHEM (NL), )
WADENSWIL BRANCH, et al. )
)
    Plaintiffs, )
)
    v. )    1:10CV276
)
MAKHTESHIM AGAN OF NORTH )
AMERICA, INC. (MANA), et al. )
)
    Defendants. )

## MEMORANDUM OPINION AND ORDER

OSTEEN, JR., District Judge

Presently before the court are numerous briefs and exhibits with respect to claim construction for claim terms at issue in these cases. A consolidated claim construction hearing ("Markman Hearing") was held on May 2, 2011, and a separate consolidated hearing as to the term "no quick knock down effect" was held on June 20, 2011. This court has considered the evidence in the record, the parties' arguments, and the relevant law, and for the

reasons stated herein, this court construes the disputed claim terms as follows:

A.   "Process for the protection of a [future] building against damage caused by insects" is construed as "Process for the protection of a [future] building against damage caused by insects that (a) requires the deliberate creation of untreated locations (i.e., loopholes) through which the crawling insect can reach the building without being exposed to the insecticide and (b) disclaims applying insecticide without loopholes around a [future] building, under a [future] building, and both around a [future] building and under a [future] building";

B.   "insecticidally active ingredient" is construed as "insecticidally active ingredient which is active by contact (contact with species to be killed) and has no repellent effect on the insects, and which has no quick knock down effect and a secondary killing action when used in the claimed solution or suspension";

C.   "no quick knock down effect" is construed as "able to produce an action of killing insects which have not been directly treated by means of the said insecticide";

D.  "secondary killing action" is construed as "an action of killing insects which have not been directly treated by means of the said insecticide";

E.  "forming treated . . . locations" is construed as "applying an effective amount of said solution or suspension to discrete locations";

F.  "forming . . . untreated locations" is construed as "forming locations along the perimeter of the building where the solution or suspension was not applied";

G.  "along the perimeter of the building" and "along the outline of the future building" are construed as "along the boundary of the [future] building";

H.  "an effective amount of said solution or suspension" is construed as "an amount of said solution or suspension that is sufficient to protect a building against damage caused by insects";

I.  "discrete locations" is construed as "locations that are separate and distinct from each other such that there remain untreated locations (i.e., loopholes) through which the crawling insect can reach the building without being exposed to the insecticide";

J.  "around or under said [future] building" is construed as "either around said [future] building or under said [future] building, but not both";

3

K. "the total perimeter of the building" is construed as "the sum of the lengths of the line segments forming the boundary of the building";

L. "no repellent action" is construed as "does not repel the insects."

## I. BACKGROUND

Presently before this court are two separate patent infringement actions, both of which were brought by Plaintiffs BASF Agro B.V., Arnhem (NL), Wädenswil Branch ("BASF") and Bayer S.A.S. ("Bayer"). In No. 10CV274, Intervenor Plaintiff Merial Limited has joined with BASF and Bayer.[1] The defendant in No. 10CV274 is Cheminova, Inc. ("Cheminova"). The defendants in No. 10CV276 are Makhteshim Agan of North America, Inc. ("MANA") and Control Solutions, Inc. ("CSI").[2] Plaintiffs allege that all three Defendants will infringe United States Patent Nos. 6,414,010 ("the '010 patent") and 6,835,743 ("the '743 patent"), in violation of 35 U.S.C. § 271.

Inventor Yasuo Kimura ("Mr. Kimura") acquired the '010 patent in 2002 and the '743 patent in 2004. Both patents are entitled "Pesticidal Pyrazoles and Derivatives," and both teach a

---

[1] Merial Limited is not a party to No. 10CV276. However, in the interest of simplicity, this court will herein refer to BASF, Bayer, and Merial Limited collectively as "Plaintiffs."

[2] In the interest of simplicity, this court will herein refer to Cheminova, MANA, and CSI collectively as "Defendants."

method of using certain insecticidal compounds.[3]  Bayer is the assignee and owner of both the '010 patent and the '743 patent (collectively, "the Kimura patents"), and BASF is the exclusive licensee of the Kimura patents in the United States with respect to the insecticidal compound Fipronil.  (See Compl. (Doc. 1, No. 10CV276) ¶¶ 13, 15.)

Plaintiffs assert that Defendants will infringe claims 1, 2, 6, 8, 9, 10, 18, 19, 21, and 23 of the '010 patent and claims 1, 2, 5, 6, 7, and 14 of the '743 patent.  (Joint Pre-Hr'g Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276) at 2.)[4]  Claims 1, 2, and 19 of the '010 patent are representative in that they include all the disputed terms of Plaintiffs' asserted claims. In pertinent part, claims 1, 2, and 19 of the '010 patent provide as follows (disputed terms are underlined):

> 1.  Process for the protection of a building against damage caused by insects comprising the steps of:
>   a)  forming a solution or suspension of an insecticidally active ingredient in a liquid, wherein the amount of the active ingredient in the liquid is from about 0.01 to about 20% by weight and the active ingredient has no quick knock down effect and a secondary killing action;

---

[3] It is undisputed that the '743 patent is a divisional patent with the same priority date and specification as the '010 patent.  (See Markman Hr'g Tr. (Doc. 118, No. 10CV274; Doc. 148, No. 10CV276) at 10-11.)

[4] All citations in this order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

b)     forming treated and untreated locations along
the perimeter of the building by applying an
effective amount of said solution or
suspension to discrete locations around or
under said building along the perimeter of
the building, wherein the treated locations
are the discrete locations along the
perimeter of the building where said solution
or suspension has been applied and the
untreated locations are the remaining
portions of the perimeter where the solution
or suspension was not applied;

wherein the combination of said treated locations and
said untreated locations along the perimeter of the
building equal the total perimeter of the building and
further wherein said treated locations make up 0.5 to
7.5 meter per 10 meter of the total perimeter of the
building, and said active ingredient is an insecticide
of the formula (I) . . . .

2.     Process according to claim 1, wherein the
active ingredient is an insecticide with contact
effect, and no repellent action against the insects.

. . . .

19.     Process for the protection of a future
building against damage caused by insects, said future
building having a proposed outline which includes at
least the location of the outer walls of the building,
said process comprising the steps of:
a)     forming a solution or suspension of an
insecticidally active ingredient in, a
liquid, wherein the amount of the active
ingredient in the liquid is from about 0.01
to about 20% by weight and the active
ingredient has no quick knock down effect and
a secondary killing action;
b)     forming treated and untreated locations along
the outline of the future building by
applying an effective amount of said solution
or suspension to discrete locations around or
under said future building along the outline
of the future building, wherein the treated
locations are the discrete locations along
the outline of the future building
where said solution or suspension has been applied
and the untreated locations are the remaining

6

> portions of the outline where the solution or
> suspension was not applied;
>> further wherein at least a portion of said untreated
>> locations do not contain an effective amount of said
>> <u>insecticidally active ingredient</u> and said active
>> ingredient is an insecticide of the formula (I) . . . .

(Compl. Ex. B (Doc. 1-3, No. 10CV276) at 5-6 (emphases added).)

## II.  APPLICABLE LAW

In <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370 (1996), the Supreme Court clarified which issues in a patent trial are properly reserved for the jury, and which are questions of law to be determined by the court.  Specifically, the Court held that interpretation of language in patent claims "is an issue for the judge, not the jury."  <u>Id.</u> at 391.  The Federal Circuit has provided further guidance on how to interpret patent claims, stating that, in general, courts are to give the words of a claim "their ordinary and customary meaning" as understood by "a person of ordinary skill in the art in question at the time of the invention."  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal quotation marks and citations omitted).

Claim construction proceeds by established rules.  A court should "[f]irst . . . look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention."  <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted).  "In construing claims, the analytical focus must begin and remain

centered on the language of the claims themselves . . . ." <u>Tex.</u>

<u>Digital Sys., Inc. v. Telegenix, Inc.</u>, 308 F.3d 1193, 1201 (Fed.

Cir. 2002) (internal quotation marks and citation omitted).

> Consulting the written description and prosecution
> history as a threshold step in the claim construction
> process, before any effort is made to discern the
> ordinary and customary meanings attributed to the words
> themselves, invites a violation of [Federal Circuit]
> precedent counseling against importing limitations into
> the claims.  For example, if an invention is disclosed
> in the written description in only one exemplary form
> or in only one embodiment, the risk of starting with
> the intrinsic record is that the single form or
> embodiment so disclosed will be read to require that
> the claim terms be limited to that single form or
> embodiment. . . .  But if the meaning of the words
> themselves would not have been understood to persons of
> skill in the art to be limited only to the examples or
> embodiments described in the specification, reading the
> words in such a confined way would mandate the wrong
> result and would violate [the Federal Circuit's]
> proscription of not reading limitations from the
> specification into the claims.

<u>Id.</u> at 1204-05 (citations omitted).  There is a "heavy

presumption" that the terms in the claims "mean what they say and

have the ordinary meaning that would be attributed to those words

by persons skilled in the relevant art."  <u>Id.</u> at 1202 (internal

quotation marks and citations omitted); <u>see also CCS Fitness,</u>

<u>Inc. v. Brunswick Corp.</u>, 288 F.3d 1359, 1366 (Fed. Cir. 2002)

("Generally speaking, we indulge a 'heavy presumption' that a

claim term carries its ordinary and customary meaning."

(citations omitted)).

The second step in the claim construction process is to look

to the specification, which "contains a written description of

the invention that must enable one of ordinary skill in the art to make and use the invention." See Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996); see also Vitronics Corp., 90 F.3d at 1582. "Claims must be read in view of the specification, of which they are a part." Markman, 52 F.3d at 979 (citations omitted). The claims define the invention, but "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Phillips, 415 F.3d at 1315 (internal quotation marks and citation omitted). "For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." Markman, 52 F.3d at 979 (citation omitted). "[A] patentee is free to be his own lexicographer[, but] any special definition given to a word must be clearly defined in the specification." Id. at 980 (citations omitted). "[C]laims are not to be interpreted by adding limitations appearing only in the specification. . . . [P]articular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." Electro Med. Sys., S.A. v. Cooper Life Scis., Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994) (citations omitted). A limitation from the specification

should only be read into the claims when the specification requires that limitation.  See id. (citation omitted).

The prosecution history, if it is in evidence, is the third type of intrinsic evidence to consult.  See Markman, 52 F.3d at 980 (citation omitted); see also Vitronics Corp., 90 F.3d at 1582 (citations omitted).  "This undisputed public record of proceedings in the Patent and Trademark Office is of primary significance in understanding the claims."  Markman, 52 F.3d at 980 (internal quotation marks and citation omitted).  "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.  Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers."  Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995) (citations omitted).

The presumption that claim terms have the ordinary meaning that would be attributed to those terms by persons skilled in the relevant art may be rebutted in three situations relevant here.

> First, the claim term will not receive its ordinary
> meaning if the patentee acted as his own lexicographer
> and clearly set forth a definition of the disputed
> claim term in either the specification or prosecution
> history.  Second, a claim term will not carry its
> ordinary meaning if the intrinsic evidence shows that
> the patentee distinguished that term from prior art on
> the basis of a particular embodiment, expressly
> disclaimed subject matter, or described a particular
> embodiment as important to the invention.
>     Third, . . . a claim term also will not have its
> ordinary meaning if the term chosen by the patentee so

> deprives the claim of clarity as to require resort to
> the other intrinsic evidence for a definite meaning.

CCS Fitness, Inc., 288 F.3d at 1366-67 (internal quotation marks, alteration, and citations omitted).

The redefinition of a claim term must be clear "so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc., 262 F.3d 1258, 1268 (Fed. Cir. 2001) (citations omitted). However, redefinition need not be explicit. Id. "[T]he specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." Id. (internal quotation marks and citation omitted).

Evidence from sources other than the claims, the specification, and the prosecution history is extrinsic and generally should be relied upon only when the intrinsic evidence fails to resolve any ambiguity in a disputed term. See Vitronics Corp., 90 F.3d at 1583. Extrinsic evidence includes "expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. A court may use extrinsic evidence to aid its understanding of a patent, but "not for the purpose of varying or contradicting the terms of the claims." Id. at 981 (citations omitted). Accordingly, the Federal Circuit has stated that "expert testimony, whether it be of an attorney, a technical expert, or the inventor, on the proper construction of a disputed

claim term . . . . may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms." Vitronics Corp., 90 F.3d at 1585 (emphasis omitted).

In such "rare instances," prior art documents and dictionaries are preferable to expert testimony because they are objective, reliable, and "accessible to the public in advance of litigation." Id.

> Dictionaries, encyclopedias and treatises, publicly available at the time the patent is issued, are objective resources that serve as reliable sources of information on the established meanings that would have been attributed to the terms of the claims by those of skill in the art. Such references are unbiased reflections of common understanding not influenced by expert testimony or events subsequent to the fixing of the intrinsic record by the grant of the patent, not colored by the motives of the parties, and not inspired by litigation. Indeed, these materials may be the most meaningful sources of information to aid judges in better understanding both the technology and the terminology used by those skilled in the art to describe the technology.

Tex. Digital Sys., Inc., 308 F.3d at 1202-03. Thus, "it is entirely proper for both trial and appellate judges to consult these materials at any stage of a litigation, regardless of whether they have been offered by a party in evidence or not." Id. at 1203. "Because words often have multiple dictionary definitions, some having no relation to the claimed invention, the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms

in issue is most consistent with the use of the words by the inventor." Id. (citations omitted).

## III. CONSTRUCTION OF THE DISPUTED CLAIM TERMS

### A. "Process for the protection of a [future] building against damage caused by insects"

Plaintiffs propose that this claim term be construed as "A treatment process for the protection of a [future] building against damage to the building caused by insects, wherein the treatment does not block substantially all routes of potential termite entry." MANA and CSI propose that this claim term be construed as "A process for the protection of the entire [future] building, not a portion thereof, against damage caused by insects." Cheminova proposes that this claim term be construed as "Protection of the entire [future] building, not a portion thereof." (Joint Pre-Hr'g Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276) at 3.)

In accordance with Federal Circuit precedent, this court begins with the claim term itself and the ordinary meaning that would be attributed to these words by a person skilled in the relevant art. Tex. Digital Sys., Inc., 308 F.3d at 1201-02. Taken in isolation, this claim term is self-explanatory and appears to require no special construction: the Kimura patents claim a process for the protection of a building against damage caused by insects, and the patents go on to describe how to practice that process. Turning to the specification, however,

13

see Markman, 52 F.3d at 979, this court finds a significant limitation of the claimed process, which is summarized in the following specification language: "Another object of the instant invention is to provide a termite treatment without barrier." (Compl. Ex. B (Doc. 1-3, No. 10CV276) at 3, col. 1, ll. 43-44.) This court finds the foregoing language to be an express, intrinsic disclaimer of subject matter, such that this claim term will not carry its ordinary meaning. See CCS Fitness, Inc., 288 F.3d at 1366-67; SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.").

The specification contains explicit guidance as to what Mr. Kimura meant by "a termite treatment without barrier," stating: "Conventional termite control operators apply the chemical around or under the building or houses to form a barrier against termites invasion. However loopholes in the treatment may cause failure of protection of the houses." (Compl. Ex. B (Doc. 1-3, No. 10CV276) at 3, col. 1, ll. 10-13.) Although this language is helpful, neither the claims nor the specification make fully

14

clear what is meant by "without barrier," and this court

therefore turns to the Kimura patents' prosecution history. <u>See</u>

<u>Markman</u>, 52 F.3d at 980.[5]

In a Patent and Trademark Office Action dated February 2,

2001, Mr. Kimura's patent application was rejected, in part

because the examiner deemed the invention unpatentable over

certain prior art. (Crystal Decl. Ex. 5 (Doc. 51-5, No. 10CV276)

at 5.) Mr. Kimura responded on August 2, 2001, with an Amendment

in which he sought to distinguish his invention from the prior

art cited by the examiner. (<u>Id.</u> Ex. 6 (Doc. 51-6, No. 10CV276).)

Mr. Kimura summarized his disagreement with the examiner as

follows:

> Although some of the documents cited by the Examiner
> teach that the continuous barrier may be created by the
> application of the insecticide at discrete locations
> around the perimeter of the building, the insecticide
> is still applied in a manner so that a continuous
> barrier is created around the building to be protected.
> None of these documents teaches the deliberate creation
> of untreated locations (i.e., loopholes) through which
> the crawling insect can reach the building without
> being exposed to the insecticide.

---

[5] Plaintiffs make a compelling argument that a person
skilled in the art at the time of Mr. Kimura's invention would
have understood "barrier" to mean only a treatment both around
and under the building. However, Mr. Kimura specifically
described a "barrier" as a treatment "around <u>or</u> under the
building," (Compl. Ex. B (Doc. 1-3, No. 10CV276) at 3, col. 1, 1.
11 (emphasis added)), and "a claim term will not carry its
ordinary meaning if the intrinsic evidence shows that the
patentee distinguished that term from prior art on the basis of a
particular embodiment, [or] expressly disclaimed subject matter,"
<u>CCS Fitness, Inc.</u>, 288 F.3d at 1366-67.

(Id. at 15.)

Despite Mr. Kimura's argument, his application was again
rejected in an Office Action dated September 20, 2001. (Crystal
Decl. Ex. 7 (Doc. 51-7, No. 10CV276) at 3.) Mr. Kimura responded
on January 22, 2002, with an Amendment After Final Rejection,
(id. Ex. 8 (Doc. 51-8, No. 10CV276)), and on January 30, 2002,
with a Supplemental Submission, the latter of which consisted of
a Declaration by Dr. Joe Hope ("Dr. Hope"), who represented
himself as "skilled in the art with respect to the control of
termites in domestic buildings, specifically the control of
subterranean termites," (id. Ex. 9 (Doc. 51-9, No. 10CV276) ¶ 5).
Dr. Hope stated that the process claimed in Mr. Kimura's
application "allows termites access to a structure that is being
protected." (Id. ¶ 11.) He stated further "[t]hat the teaching
of the common general knowledge and prior art as of [the priority
date of Mr. Kimura's application] directs the skilled artisan to
make a barrier treatment of chemical insecticide around a
structure in order to ensure that the said chemical insecticide
is unavoidable by termites (i.e., no untreated locations)." (Id.
¶ 12.)

In light of the foregoing, this court finds that, in both
the specification and during prosecution, Mr. Kimura disclaimed
insecticide application methods that "ensure that the . . .
chemical insecticide is unavoidable by termites." (Id.) What

Mr. Kimura claimed as his own invention is an insecticide application method that "teaches the deliberate creation of untreated locations (i.e., loopholes) through which the crawling insect can reach the building without being exposed to the insecticide." (Crystal Decl. Ex. 6 (Doc. 51-6, No. 10CV276) at 15.)

While the prosecution history clarifies that Mr. Kimura disavowed insecticide application methods that aim to eliminate "loopholes," it is the patent specification that demonstrates the extent to which Mr. Kimura disclaimed such methods. As noted above, the specification states: "Conventional termite control operators apply the chemical around or under the building or houses to form a barrier against termites invasion. However loopholes in the treatment may cause failure of protection of the houses." (Compl. Ex. B (Doc. 1-3, No. 10CV276) at 3, col. 1, ll. 10-13 (emphasis added).) This language makes it clear that Mr. Kimura's understanding, at least for purposes of prosecuting the instant patents, was that applying insecticide without loopholes either around or under a building would constitute a barrier treatment.[6] In other words, according to Mr. Kimura, applying

_____

[6] There is no dispute that "around" and "under" refer to different treatment locations. (See Markman Hr'g Tr. (Doc. 118, No. 10CV274; Doc. 148, No. 10CV276) at 48 ("[A]round means exterior. We agree with that. Under means interior, we agree with that.").) Thus, this court finds that "or" in the phrase "around or under" is used in its disjunctive sense, not its explanatory sense.

insecticide without loopholes around a building, but not under the building, would constitute a barrier treatment. Likewise, according to Mr. Kimura, applying insecticide without loopholes under a building, but not around the building, would constitute a barrier treatment. Thus, when Mr. Kimura disclaimed barrier treatments, (id. at 3, col. 1, ll. 43-44 ("Another object of the instant invention is to provide a termite treatment without barrier.")), he disclaimed applying insecticide without loopholes around a building, and applying insecticide without loopholes under a building, respectively.

The prosecution history supports this construction and takes Mr. Kimura's disclaimer one step further. In helping to distinguish Mr. Kimura's application from the prior art cited by the examiner, Dr. Hope stated:

> 12. That the teaching of the common general knowledge and prior art as of [the priority date of Mr. Kimura's application] directs the skilled artisan to make a barrier treatment of chemical insecticide around a structure in order to ensure that the said chemical insecticide is unavoidable by termites (i.e., no untreated locations).
>
> . . . .
>
> 14. That, for example, in US Patent 3,624,953 to Crosby, Crosby recites a method wherein a volatile insecticide is placed at discrete locations around a house with the intention that the insecticide may vaporize and thus create a barrier to termite ingress.
>
> 15. That for example, in US patent 5,347,749 to Chitwood et al., Chitwood et al. recite a method of resaturating a dirt layer beneath and around a

foundation of a house so as to renew a previously applied <u>barrier</u> treatment against termites.

16. That, for example, in US patent 5,390,440 to Mihealsick, Mihealsick recites a method of accurately measuring the amount of extermination fluid that would be placed <u>under</u> a concrete slab <u>and/or around</u> a house to optimise the dose; and that this method is understood by a person of ordinary skill in the art as a method of creating or regenerating a <u>barrier</u> to termites.

(Crystal Decl. Ex. 9 (Doc. 51-9, No. 10CV276) ¶¶ 12, 14-16

(emphases added).) Dr. Hope's description of the Crosby prior

art demonstrates his understanding that applying insecticide

without loopholes only around a building would constitute a

barrier treatment. His description of the Chitwood prior art

demonstrates his understanding that applying insecticide without

loopholes both around and under a building would constitute a

barrier treatment. Finally, Dr. Hope's description of the

Mihealsick prior art demonstrates his understanding that applying

insecticide without loopholes only around a building, only under

a building, or both around and under a building would constitute

a barrier treatment. Thus, the intrinsic record shows that when

Mr. Kimura disclaimed barrier treatments, (Compl. Ex. B (Doc. 1-

3, No. 10CV276) at 3, col. 1, ll. 43-44 ("Another object of the

instant invention is to provide a termite treatment without

barrier.")), he disclaimed applying insecticide without loopholes

around a building, under a building, and both around and under a

building.[7] See Ekchian v. Home Depot, Inc., 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover . . . ."); see also Ormco Corp. v. Align Tech., Inc., 498 F.3d 1307, 1316 (Fed. Cir. 2007) ("The situation here involves specifications that in all respects tell us what the claims mean, buttressed by statements made during prosecution in order to overcome a rejection over prior art. Accordingly, to attribute to the claims a meaning broader than any indicated in the patents and their prosecution history would be to ignore the totality of the facts of the case and exalt slogans over real meaning.").

---

[7] Mr. Kimura's disclaimer of applying insecticide without loopholes both around and under a building is not based on his statement in the specification that "[c]onventional termite control operators apply the chemical around or under the building or houses to form a barrier against termites invasion." (See Compl. Ex. B (Doc. 1-3, No. 10CV276) at 3, col. 1, ll. 10-12 (emphasis added).) Rather, this portion of Mr. Kimura's disclaimer is contained in Dr. Hope's statements distinguishing Mr. Kimura's invention from the prior art. See Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 452 (Fed. Cir. 1985) ("[The prosecution history] includes all express representations made by or on behalf of the applicant to the examiner to induce a patent grant . . . . Such representations include amendments to the claims and arguments made to convince the examiner that the claimed invention meets the statutory requirements of novelty, utility, and nonobviousness. Thus, the prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." (emphasis added)). Thus, there is no inconsistency in this court's interpretation of the Kimura patents' use of the word "or." See supra note 6 and accompanying text; infra Part III.J.

Plaintiffs concede that Mr. Kimura disclaimed barrier treatments, (Pls.' Mem. Law Supp. Mot. Clarification (Doc. 179, No. 10CV276) at 7), but they argue that this court's analysis of Dr. Hope's declaration, as suggested by this court's order denying Plaintiffs' motion for a preliminary injunction in No. 10CV276 (Doc. 173, No. 10CV276), overstates the breadth of the disclaimer. Plaintiffs note that "Chitwood and Mihealsick deal, in part, with the concept of 'retreatment' of a structure." (Pls.' Mem. Law Supp. Mot. Clarification (Doc. 179, No. 10CV276) at 9.) They go on to state:

> Importantly, because a retreatment only required treatment at those locations where the barrier had been broken (i.e., disrupted), a retreatment application may occur inside, outside, or both inside and outside a building. In each instance, however, the "barrier" was understood to mean the combined treatment inside and outside the building, and the retreatment "perfected" that barrier treatment.

(Id. at 9-10.) Assuming, arguendo, that the distinction between regenerating a barrier and creating a barrier is significant for purposes of determining the scope of Mr. Kimura's disclaimer, this court observes that Dr. Hope's description of the Mihealsick prior art demonstrates his understanding that applying insecticide without loopholes only around a building, only under a building, or both around and under a building constitutes "a method of creating or regenerating a barrier to termites." (Crystal Decl. Ex. 9 (Doc. 51-9, No. 10CV276) ¶ 16 (emphases added).) Thus, the substance of Plaintiffs' argument as to the

21

distinction between regenerating a barrier and creating a barrier has no effect on the breadth of Mr. Kimura's disclaimer.

Plaintiffs also point out that the Crosby prior art "teaches away from liquid termiticide treatments, which is the treatment method claimed by the [Kimura patents]." (Pls.' Mem. Law Supp. Mot. Clarification (Doc. 179, No. 10CV276) at 11.) Plaintiffs contend that "[i]t is improper to limit the meaning of a liquid termiticide barrier treatment (Kimura) by relying on a disclosure of a device that forms a vapor barrier (Crosby)." (Id.) Assuming, arguendo, that the distinction between vapor treatments and liquid treatments is significant for purposes of determining the scope of Mr. Kimura's disclaimer, this court need only look once again to Dr. Hope's description of the Mihealsick prior art for a disavowal of claim scope that encompasses liquid treatments such as the Kimura method. (Crystal Decl. Ex. 9 (Doc. 51-9, No. 10CV276) ¶ 16 (describing Mihealsick as a method involving "extermination fluid" (emphasis added)).) The distinction between vapor treatments and liquid treatments therefore has no effect on the breadth of Mr. Kimura's disclaimer.

This court finds that Dr. Hope's description of the Mihealsick prior art is broad enough to cover both liquid termiticide treatments and the initial creation of a barrier. Moreover, that description serves to disclaim the application of insecticide without loopholes around a building, under a

building, and both around and under a building.  It is also
consistent with Mr. Kimura's description of a barrier.

Plaintiffs assert that, contrary to Dr. Hope's description,
"Mihealsick teaches treating on <u>both</u> sides of the boundary wall
to form a barrier."  (Pls.' Mem. Law Supp. Mot. Clarification
(Doc. 179, No. 10CV276) at 11.)  While it is possible that the
Mihealsick prior art requires treatment both around and under the
building, that is not what Dr. Hope articulated, or what Mr.
Kimura submitted, during prosecution of the Kimura patents.
(Crystal Decl. Ex. 9 (Doc. 51-9, No. 10CV276) ¶ 16 (describing
Mihealsick as a method involving placement of "extermination
fluid . . . under a concrete slab <u>and/or</u> around a house"
(emphasis added)).)[8]  Mr. Kimura submitted Dr. Hope's statements
in order to define the prior art, distinguish his invention from
that prior art, and thereby obtain the Kimura patents.  (<u>See</u> <u>id.</u>
Ex. 8 (Doc. 51-8, No. 10CV276) at 10 (prefacing Dr. Hope's
declaration: "Applicants and their representative wish to thank
the Examiner for the personal interview that was conducted on
December 18, 2001.  During the interview, the Examiner . . . .

---

[8] This court finds that focusing on the interpretations of
the prior art that were advanced during prosecution of the Kimura
patents, instead of inquiring into the actual teachings of the
prior art, is in accord with Federal Circuit precedent.  For
example, in <u>Rhodia Chimie v. PPG Industries, Inc.</u>, the Federal
Circuit looked to the interpretations of prior art that the
patentee offered during prosecution, rather than construing the
prior art as a matter of law, in order to determine what was
disclaimed.  402 F.3d 1371, 1384-85 (Fed. Cir. 2005).

23

agreed that he would consider and look favorably upon an opinion

Declaration from a skilled artisan that . . . discussed the cited

prior art and distinguished it from the presently claimed

invention . . . .").) Dr. Hope's statements cannot now be

rescinded in order to broaden the Kimura patents' scope.

Southwall Techs., Inc., 54 F.3d at 1576 ("The prosecution history

limits the interpretation of claim terms so as to exclude any

interpretation that was disclaimed during prosecution. Claims

may not be construed one way in order to obtain their allowance

and in a different way against accused infringers." (citations

omitted)).

Plaintiffs have presented extrinsic evidence in support of

the proposition that a person of ordinary skill in the relevant

art at the time of Mr. Kimura's invention would have understood

"barrier" to mean only an insecticide application without

loopholes both around and under a building. (See Joint Pre-Hr'g

Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276) at 4-6.)

Even assuming, arguendo, that such was the state of the art at

the time of Mr. Kimura's invention, this court may not use

extrinsic evidence to vary or contradict the intrinsic record.

See Markman, 52 F.3d at 981. The intrinsic evidence establishes

how Mr. Kimura defined barrier treatments for purposes of .

prosecuting the instant patents, and therefore demonstrates what

Mr. Kimura disclaimed when he disavowed such treatments. See

<u>Bell Atl. Network Servs., Inc.</u>, 262 F.3d at 1269 ("[Extrinsic evidence] may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." (citation omitted)); <u>cf.</u> <u>CCS Fitness, Inc.</u>, 288 F.3d at 1366-67 (stating that claim terms will not be given their ordinary meaning if the patentee acted as his own lexicographer in the intrinsic record or if the intrinsic evidence shows that the patentee expressly disclaimed subject matter).[9]

For the foregoing reasons, this court concludes that "Process for the protection of a [future] building against damage caused by insects" should be construed as "Process for the protection of a [future] building against damage caused by insects that (a) requires the deliberate creation of untreated locations (i.e., loopholes) through which the crawling insect can reach the building without being exposed to the insecticide and (b) disclaims applying insecticide without loopholes around a

---

[9] Plaintiffs' argument that "barrier" was understood by persons skilled in the art as a treatment both around and under a building is persuasive to some extent. Presumably, insects can access a building from underneath the structure. Thus, a barrier around a building, but not under the building, could leave the building susceptible to damage caused by insects. Nevertheless, it appears to this court that both Mr. Kimura and Dr. Hope understood the terms "or" and "and/or" and used those terms to give specific meaning to the disclaimer of barrier treatments in order to secure the Kimura patents. For further discussion of the Kimura patents' use of the word "or," see Part III.J, <u>infra</u>.

[future] building, under a [future] building, and both around a
[future] building and under a [future] building."[10]

   **B.   "insecticidally active ingredient"**

   Plaintiffs propose that this claim term be construed as
"Insecticidally active chemical or substance as used in the
claimed solution or suspension."   MANA and CSI propose that this
claim term be construed as "an insecticide of the formula (I)."
Cheminova proposes that this claim term be construed as "A
compound with the formula (I) as set forth in claim 1 of the '010
Patent and claim 1 of the '743 Patent and having no quick knock

---

[10] This court recognizes that "[i]f the body of the claim
sets out the complete invention, and the preamble is not
necessary to give life, meaning and vitality to the claim, then
the preamble is of no significance to claim construction because
it cannot be said to constitute or explain a claim limitation."
Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc., 246 F.3d 1368,
1373 (Fed. Cir. 2001) (internal quotation marks and citation
omitted).   To be clear, although this court has incorporated the
disclaimer from the specification and prosecution history into
its construction of the disputed term "Process for the protection
of a [future] building against damage caused by insects," this
court does not find the disclaimer to be necessitated by any
particular language of the instant term.   This court simply finds
that the instant term is the best means of recognizing Mr.
Kimura's disclaimer of barrier treatments, which affects all the
asserted claims of the Kimura patents.   In other words, this
court finds Mr. Kimura's disclaimer, rather than the specific
language of the instant term, to be significant for claim
construction purposes.   See SciMed Life Sys., Inc., 242 F.3d at
1341 ("Where the specification makes clear that the invention
does not include a particular feature, that feature is deemed to
be outside the reach of the claims of the patent, even though the
language of the claims, read without reference to the
specification, might be considered broad enough to encompass the
feature in question.").

down effect and a secondary killing action." (Joint Pre-Hr'g Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276) at 8.)

This court begins with the claim term itself and the ordinary meaning that would be attributed to these words by a person skilled in the relevant art. Tex. Digital Sys., Inc., 308 F.3d at 1201-02. The term appears simply to refer to an ingredient that kills insects. However, when read in light of the specification, see Markman, 52 F.3d at 979, this term is much more limited. The specification states: "The insecticidally active material which can be used in the invention is an active ingredient which is active by contact (contact with species to be killed) and has no repellent effect on the insects, preferably no repellent effect on the insects to be killed." (Compl. Ex. B (Doc. 1-3, No. 10CV276) at 3, col. 1, ll. 54-58 (emphasis added).) Based on this language, this court finds that "the intrinsic evidence shows that the patentee . . . described a particular embodiment as important to the invention" such that the instant term "will not carry its ordinary meaning." See CCS Fitness, Inc., 288 F.3d at 1366-67.

This court is wary of reading limitations from exemplary embodiments into the claims. See Tex. Digital Sys., Inc., 308 F.3d at 1204-05. However, the limitation at issue is not presented as a mere exemplary embodiment of the claimed invention. Rather, it is presented as the only embodiment of the

claimed invention. Mr. Kimura used the definite article "The" rather than the indefinite "An" at the beginning of the quoted sentence from the specification, thus indicating his intent to limit the instant claim term to a particular type of insecticidally active ingredient. This court finds that Mr. Kimura limited this term clearly enough "to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." See Bell Atl. Network Servs., Inc., 262 F.3d at 1268.

This court next considers the prosecution history, see Markman, 52 F.3d at 980, and finds that it contains no further limitation or redefinition of the instant claim term. Further, this court finds no ambiguity in the intrinsic record as it relates to the instant term, and therefore finds that consultation of extrinsic evidence is unnecessary. See Vitronics Corp., 90 F.3d at 1583.

For the foregoing reasons, this court concludes that "insecticidally active ingredient" should be construed as "insecticidally active ingredient which is active by contact (contact with species to be killed) and has no repellent effect on the insects, and which has no quick knock down effect and a secondary killing action when used in the claimed solution or suspension."

In view of the parties' arguments and the relevant language of claim 1, this court will address a further point of contention between the parties relating to the instant claim term. In pertinent part, claim 1 provides:

> 1. Process for the protection of a building against damage caused by insects comprising the steps of:
> a) forming a solution or suspension of an insecticidally active ingredient in a liquid, <u>wherein</u> the amount of the active ingredient in the liquid is from about 0.01 to about 20% by weight and the active ingredient has no quick knock down effect and a secondary killing action . . . .

(Compl. Ex. B (Doc. 1-3, No. 10CV276) at 5, col. 5, ll. 51-57 (emphasis added).) As noted above, Plaintiffs propose that "insecticidally active ingredient" be construed as "Insecticidally active chemical or substance as used in the claimed solution or suspension." Meanwhile, Cheminova proposes that this claim term be construed as "A compound with the formula (I) as set forth in claim 1 of the '010 Patent and claim 1 of the '743 Patent and having no quick knock down effect and a secondary killing action." The contested issue is whether the claim indicates that the insecticidally active ingredient itself "has no quick knock down effect and a secondary killing action," or whether the insecticidally active ingredient has those characteristics when it is used in the claimed "solution or suspension." This court finds that the word "wherein" and

everything that follows it in step a) of claim 1 (including the language regarding "the amount of the active ingredient in the liquid" as well as the phrase "the active ingredient has no quick knock down effect and a secondary killing action") modifies "a solution or suspension of an insecticidally active ingredient in a liquid." In other words, the claim does not require the insecticidally active ingredient itself to have "no quick knock down effect and a secondary killing action." Instead, the claim requires the insecticidally active ingredient to bear those characteristics when it is used in the claimed solution or suspension. This court further finds that, through the language of claim 1, Mr. Kimura limited this term clearly enough "to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." See Bell Atl. Network Servs., Inc., 262 F.3d at 1268.

For the foregoing reasons, this court concludes that "insecticidally active ingredient" should be construed as "insecticidally active ingredient which is active by contact (contact with species to be killed) and has no repellent effect on the insects, and which has no quick knock down effect and a secondary killing action when used in the claimed solution or suspension."

C.    "no quick knock down effect"

Plaintiffs propose that this claim term be construed as "Not killed quickly upon contact." MANA and CSI contend that this claim term is undefined. Cheminova contends that this claim term is indefinite. (Joint Pre-Hr'g Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276) at 9.)

This court begins with the claim term itself and the ordinary meaning that would be attributed to these words by a person skilled in the relevant art. Tex. Digital Sys., Inc., 308 F.3d at 1201-02. The meaning of this claim term is not immediately clear. For example, the term does not disclose on its face what sort of time frame is contemplated by the word "quick," nor does it indicate whether "knock down effect" refers to a killing effect, as opposed to an incapacitating effect. Because "[i]diosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification," Intervet Inc. v. Merial Ltd., 617 F.3d 1282, 1287 (Fed. Cir. 2010) (citing Phillips, 415 F.3d at 1315), this court looks for guidance in the specification. There the court finds the following language:

> A preferred class of active ingredient which can be used in the invention are the compounds without quick knock-down effect, or compounds able to produce a so-called secondary killing effect, that is to say an action of killing insects which have not been directly treated by mean [sic] of the said insecticide.

(Compl. Ex. B (Doc. 1-3, No. 10CV276) at 3, col. 1, ll. 59-67.)
This court finds that, through this explanatory language from the
specification, Mr. Kimura defined "no quick knock down effect"
"by implication such that the meaning may be found in or
ascertained by a reading of the patent documents." See <u>Bell Atl.</u>
<u>Network Servs., Inc.</u>, 262 F.3d at 1268 (internal quotation marks
and citation omitted). Namely, the patent specification defines
"no quick knock down effect" as "able to produce an action of
killing insects which have not been directly treated by means of
the said insecticide."

This court next considers the prosecution history, <u>see</u>
<u>Markman</u>, 52 F.3d at 980, and finds nothing therein to counsel
against construing the instant term consistently with the
definition supplied in the patent specification. Moreover, in
light of that definition, this court finds no ambiguity in the
intrinsic record as it relates to the instant term, and therefore
finds that consultation of extrinsic evidence is unnecessary.
See <u>Vitronics Corp.</u>, 90 F.3d at 1583.

This court notes Defendants' contention that this claim term
is indefinite. Given the definition of the instant term in the
patent specification, as well as Federal Circuit precedent
instructing that "[a]mbiguous claims, whenever possible, should
be construed so as to preserve their validity," <u>Tex. Instruments</u>
<u>Inc. v. U.S. Int'l Trade Comm'n</u>, 871 F.2d 1054, 1065 (Fed. Cir.

1989) (citation omitted), this court is not persuaded by Defendants' indefiniteness arguments at this stage of the litigation.[11]

For the foregoing reasons, this court concludes that "no quick knock down effect" should be construed as "able to produce an action of killing insects which have not been directly treated by means of the said insecticide."

###    D.    "secondary killing action"

Plaintiffs propose that this claim term be construed as "An action of killing insects which have not been directly treated by means of the said insecticide."  MANA and CSI propose that this claim term be construed as "the ability of the active ingredient to kill insects that have only been exposed to the active ingredient via another insect."  Cheminova proposes that this claim term be construed as "An action of killing insects which have not been directly treated by means of the said insecticide." (Joint Pre-Hr'g Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276) at 10.)

This court begins with the claim term itself and the ordinary meaning that would be attributed to these words by a person skilled in the relevant art.  Tex. Digital Sys., Inc., 308 F.3d at 1201-02.  In light of the plain meaning of the words

---

[11] This court's construction of "no quick knock down effect" based on the relevant specification language is without prejudice to future arguments regarding indefiniteness.

"secondary killing action" and (to the extent there is ambiguity

in the instant term) the evidence of record regarding the social,

communal nature of termites, (e.g., App. Pls.' Opening Claim

Construction Br. Ex. 13 (Doc. 49-13, No. 10CV276)),[12] the

constructions proposed by the parties appear to be reasonable.

With this in mind, the court turns to the specification for

further guidance. See Markman, 52 F.3d at 979. The court notes

the following specification language:

> A preferred class of active ingredient which can
> be used in the invention are the compounds without
> quick knock-down effect, or compounds able to produce a
> so-called secondary killing effect, that is to say an
> action of killing insects which have not been directly
> treated by mean [sic] of the said insecticide.

(Compl. Ex. B (Doc. 1-3, No. 10CV276) at 3, col. 1, ll. 59-64

(emphasis added).) "For claim construction purposes, the

description may act as a sort of dictionary, which explains the

invention and may define terms used in the claims." Markman, 52

F.3d at 979 (citation omitted). This court finds that the quoted

specification language clearly defines "secondary killing

action." See id. at 980.

This court next considers the prosecution history, see id.,

and finds nothing therein to counsel against construing the

instant term consistently with the definition supplied in the

---

[12] This extrinsic evidence is "used for the court's
understanding of the patent, not for the purpose of varying or
contradicting the terms of the claims." See Markman, 52 F.3d at
981.

patent specification. Moreover, in light of that definition, this court finds no further ambiguity in the intrinsic record as it relates to the instant term, and therefore finds that additional consultation of extrinsic evidence is unnecessary. See Vitronics Corp., 90 F.3d at 1583.

For the foregoing reasons, this court concludes that "secondary killing action" should be construed as "an action of killing insects which have not been directly treated by means of the said insecticide."

### E. "forming treated . . . locations"

Plaintiffs propose that this claim term be construed as "[forming t]he locations . . . where said solution or suspension has been applied." MANA and CSI propose that this claim term be construed as "forming non-continuous locations either around or under the building (but not both) where there is an effective amount of the solution or suspension." Cheminova proposes that this claim term be construed as "[forming d]iscrete locations where an effective amount of solution or suspension has been put." (See Joint Pre-Hr'g Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276) at 11.)

This court begins with the claim term itself and the ordinary meaning that would be attributed to these words by a person skilled in the relevant art. Tex. Digital Sys., Inc., 308 F.3d at 1201-02. This claim term appears to require no special

construction: the Kimura patents instruct the person skilled in the art to apply an insecticide solution or suspension to certain locations. Indeed, the claim itself teaches the formation of "treated . . . locations . . . by applying an effective amount of said solution or suspension to discrete locations." (Compl. Ex. B (Doc. 1-3, No. 10CV276) at 5, col. 5, ll. 58-61.)

Reading this claim term in light of the specification, <u>see</u> <u>Markman</u>, 52 F.3d at 979, this court finds no reason to deviate from the plain meaning of the description contained in the claim itself. Likewise, there is nothing in the prosecution history, <u>see</u> <u>id.</u> at 980, to dissuade this court from construing the instant term consistently with the description contained in the claim. Further, this court finds no ambiguity in the intrinsic record as it relates to the instant term, and therefore finds that consultation of extrinsic evidence is unnecessary. <u>See</u> <u>Vitronics Corp.</u>, 90 F.3d at 1583.

For the foregoing reasons, this court concludes that "forming treated . . . locations" should be construed as "applying an effective amount of said solution or suspension to discrete locations."

F. **"forming . . . untreated locations"**

Plaintiffs propose that this claim term be construed as "[forming t]he locations . . . where said solution or suspension was not applied." MANA and CSI propose that this claim term be

36

construed as "forming non-continuous locations through which
insects may crawl and reach the building without being exposed to
an effective amount of the solution or suspension." Cheminova
proposes that this claim term be construed as "[forming
l]ocations where the solution or suspension has not been put and
through which the insects may crawl and reach the building
without being exposed to the solution or suspension." (See Joint
Pre-Hr'g Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276)
at 11-12.)

     This court begins with the claim term itself and the
ordinary meaning that would be attributed to these words by a
person skilled in the relevant art. Tex. Digital Sys., Inc., 308
F.3d at 1201-02. This claim term appears to require no special
construction: the Kimura patents instruct the person skilled in
the art to apply an insecticide solution or suspension to certain
locations and to leave other locations untreated. Indeed, the
claim itself states that "the untreated locations are the
remaining portions of the perimeter where the solution or
suspension was not applied." (Compl. Ex. B (Doc. 1-3, No.
10CV276) at 5, col. 5, ll. 65-67.)

     Reading this claim term in light of the specification, see
Markman, 52 F.3d at 979, this court finds no reason to deviate
from the plain meaning of the description contained in the claim
itself. Likewise, there is nothing in the prosecution history,

see id. at 980, to dissuade this court from construing the instant term consistently with the description contained in the claim. Further, this court finds no ambiguity in the intrinsic record as it relates to the instant term, and therefore finds that consultation of extrinsic evidence is unnecessary. See Vitronics Corp., 90 F.3d at 1583.

For the foregoing reasons, this court concludes that "forming . . . untreated locations" should be construed as "forming locations along the perimeter of the building where the solution or suspension was not applied."

### G.    "along the perimeter of the building"/"along the outline of the future building"

Plaintiffs propose that "along the perimeter of the building" be construed as "along the boundary (both interior and exterior) of the building." MANA and CSI propose that this claim term be construed as "along the interior or exterior of the boundary of the building, but not both." Cheminova proposes that this claim term be construed as "Along the interior or exterior of the boundary of the building, but not both." (See Joint Pre-Hr'g Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276) at 11-12.)

Plaintiffs propose that "along the outline of the future building" be construed as "along the boundary (both interior and exterior) of the future building." MANA and CSI propose that this claim term be construed as "along the inside or outside of

38

the future outline of the future building, but not both."
Cheminova proposes that this claim term be construed as "Along
the inside or the outside of the line marking the outer limits of
the future building, but not both."[13] (See id. at 11-13.)

This court begins with the claim terms themselves and the
ordinary meaning that would be attributed to these words by a
person skilled in the relevant art. Tex. Digital Sys., Inc., 308
F.3d at 1201-02. These claim terms appear to be self-explanatory
and in need of no special construction. To the extent there is
ambiguity in the word "perimeter," this court finds the following
dictionary definition of that word to be useful: "the boundary of
a closed plane figure." Webster's Third New International
Dictionary 1680 (1986); see also Tex. Digital Sys., Inc., 308
F.3d at 1203 ("[I]t is entirely proper for both trial and
appellate judges to consult [dictionaries] at any stage of a
litigation, regardless of whether they have been offered by a
party in evidence or not.").[14]

_____

[13] There is no dispute that, for purposes of construing the
Kimura patents, "around," "exterior," and "outside" are all
equivalent. Likewise, there is no dispute that "under,"
"interior," and "inside" are all equivalent. (See Markman Hr'g
Tr. (Doc. 118, No. 10CV274; Doc. 148, No. 10CV276) at 48
("[A]round means exterior. We agree with that. Under means
interior, we agree with that.").)

[14] This court finds no evidence that a person of ordinary
skill in the relevant art at the time of Mr. Kimura's invention
would have understood "perimeter" to mean anything other than its
customary, dictionary meanings. Thus, this extrinsic evidence is
not used "for the purpose of varying or contradicting the terms

Reading these claim terms in light of the specification, <u>see</u> <u>Markman</u>, 52 F.3d at 979, this court finds no reason to deviate from the terms' plain meaning. Likewise, there is nothing in the prosecution history, <u>see</u> <u>id.</u> at 980, to dissuade this court from construing the instant terms consistently with their plain meaning. Moreover, this court finds no further ambiguity in the intrinsic record as it relates to the instant terms, and therefore finds that additional consultation of extrinsic evidence is unnecessary. <u>See</u> <u>Vitronics Corp.</u>, 90 F.3d at 1583.

Both Plaintiffs and Defendants propose constructions that are more limited than the terms' plain meaning. Plaintiffs propose that these claim terms be construed as "along the boundary (both interior and exterior) of the [future] building." Plaintiffs assert that a person of skill in the art at the time of Mr. Kimura's invention would have understood "along" to refer to both the interior and the exterior of the building's perimeter. (Pls.' Opening Claim Construction Br. (Doc. 48, No. 10CV276) at 12-13.) In support of this contention, Plaintiffs argue that "barrier" treatment methods constituted the state of the art at that time and that such methods required treatment of both the interior and the exterior of the building to be protected. (<u>Id.</u>) Regardless of whether this is true, the Kimura patents do not teach a barrier treatment method. As discussed in

_____

of the claims." <u>See</u> <u>Markman</u>, 52 F.3d at 981.

Part III.A, supra, Mr. Kimura disclaimed barrier treatments with sufficient clarity to put those skilled in the art on notice that barrier methods are excluded under the teachings of the Kimura patents. Further, the two examples contained in the Kimura patents' specification demonstrate that the patents do not require treatment along both the interior and the exterior of the building. Example 1 shows treatment along the exterior only, and Example 2 describes treatment only along the interior. (Compl. Ex. B (Doc. 1-3, No. 10CV276) at 5, col. 5, ll. 18-49.) In accordance with the specification's explicit instructions, those examples "should not be used to restrict or limit the . . . invention." (Id. at 5, col. 5, ll. 15-17.) See also Tex. Digital Sys., Inc., 308 F.3d at 1204-05; Electro Med. Sys., S.A., 34 F.3d at 1054. In other words, the examples do not demonstrate a disclaimer of treatment along both the interior and the exterior of the building. However, they do clearly show that treatment along both the interior and the exterior is not an absolute requirement of the Kimura method.

Defendants, meanwhile, propose construing "along the perimeter of the building" as "along the interior or exterior of the boundary of the building, but not both," and their proposed constructions of "along the outline of the future building" likewise include the limitation "but not both." Defendants base these constructions partially on the aforementioned examples from

the Kimura patents' specification. (Def.'s Opening Claim Construction Br. (Doc. 70, No. 10CV274) at 19; Defs.' Opening Br. Claim Construction (Doc. 50, No. 10CV276) at 19.) However, as this court has just noted, the examples do not demonstrate a disclaimer of treatment along both the interior and the exterior of the building. Defendants have presented other intrinsic evidence in support of their proposed constructions of the instant claim terms, but this court finds that this evidence is more apposite to other disputed claim terms and will address it accordingly.

For the foregoing reasons, this court concludes that "along the perimeter of the building" and "along the outline of the future building" should be construed as "along the boundary of the [future] building."

H.    "an effective amount of said solution or suspension"

Plaintiffs propose that this claim term be construed as "An amount of solution or suspension sufficient to protect a building against damage caused by insects." MANA and CSI propose that this claim term be given its ordinary meaning. Cheminova proposes that this claim term be given its "[p]lain meaning as shown by customary usage, and as shown in claim 1 of the '010 and '743 Patents." Alternatively, Cheminova proposes that this claim term be construed as "the amount of the solution needed to have

its intended effects on the insects." (Joint Pre-Hr'g Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276) at 14.)

This court begins with the claim term itself and the ordinary meaning that would be attributed to these words by a person skilled in the relevant art. <u>Tex. Digital Sys., Inc.</u>, 308 F.3d at 1201-02. This claim term appears to require no special construction: the Kimura patents instruct the person skilled in the art to apply an insecticide solution or suspension in an amount that is sufficient to have its intended effect, which, generally, is to "protect[] . . . a building against damage caused by insects." (Compl. Ex. B (Doc. 1-3, No. 10CV276) at 5, col. 5, ll. 51-52.)

Reading this claim term in light of the specification, <u>see</u> <u>Markman</u>, 52 F.3d at 979, this court finds no reason to deviate from the term's plain meaning. Likewise, there is nothing in the prosecution history, <u>see</u> <u>id.</u> at 980, to dissuade this court from construing the instant term consistently with its plain meaning. Further, this court finds no ambiguity in the intrinsic record as it relates to the instant term, and therefore finds that consultation of extrinsic evidence is unnecessary. <u>See</u> <u>Vitronics Corp.</u>, 90 F.3d at 1583.

For the foregoing reasons, this court concludes that "an effective amount of said solution or suspension" should be construed as "an amount of said solution or suspension that is

sufficient to protect a building against damage caused by insects."

I.    "discrete locations"

Plaintiffs propose that this claim term be construed as "Those treated locations."  MANA and CSI propose that this claim term be construed as "non-continuous locations."  Cheminova proposes that this claim term be construed as "Non-continuous locations."  (See Joint Pre-Hr'g Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276) at 15.)

This court begins with the claim term itself and the ordinary meaning that would be attributed to these words by a person skilled in the relevant art.  Tex. Digital Sys., Inc., 308 F.3d at 1201-02.  This claim term appears to require no special construction: the Kimura patents instruct the person skilled in the art to apply an insecticide solution or suspension to locations along the perimeter of a building that are separate and distinct from each other.  See Webster's Third New International Dictionary 647.[15]

Turning to the specification and subsequently to the prosecution history, see Markman, 52 F.3d at 979-80, this court

---

[15] This court finds no evidence that a person of ordinary skill in the relevant art at the time of Mr. Kimura's invention would have understood "discrete" to mean anything other than its customary, dictionary meanings.  Thus, this extrinsic evidence is not used "for the purpose of varying or contradicting the terms of the claims."  See Markman, 52 F.3d at 981.

has found, based on intrinsic evidence associated with Mr. Kimura's explicit disclaimer of "barrier" treatment methods, that the term "Process for the protection of a [future] building against damage caused by insects" should be construed as "Process for the protection of a [future] building against damage caused by insects that (a) requires the deliberate creation of untreated locations (i.e., loopholes) through which the crawling insect can reach the building without being exposed to the insecticide and (b) disclaims applying insecticide without loopholes around a [future] building, under a [future] building, and both around a [future] building and under a [future] building." See supra Part III.A. In light of these limitations on the claimed process, which are contained in the specification and the prosecution history, it is clear that the "discrete locations" at which the insecticide is applied must be such that there remain untreated locations through which insects can reach the building without being exposed to the insecticide.

Because it is clear from the claims, the specification, and the prosecution history what "discrete locations" must mean, this court finds no ambiguity in the intrinsic record as it relates to the instant term, and therefore finds that consultation of extrinsic evidence is unnecessary. See Vitronics Corp., 90 F.3d at 1583.

For the foregoing reasons, this court concludes that "discrete locations" should be construed as "locations that are separate and distinct from each other such that there remain untreated locations (i.e., loopholes) through which the crawling insect can reach the building without being exposed to the insecticide."

## J.    "around or under said [future] building"

Plaintiffs propose that this claim term be construed as "along the perimeter (both interior and exterior) of the [future] building." MANA and CSI propose that, in construing this claim term, this court should give the term "or" its "ordinary meaning" as "the disjunctive of around and under." Cheminova proposes that, in construing this claim term, this court should give the term "or" its "[p]lain meaning" as "the disjunctive of 'around' and 'under.'" (See Joint Pre-Hr'g Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276) at 15.)

This court begins with the claim term itself and the ordinary meaning that would be attributed to these words by a person skilled in the relevant art. Tex. Digital Sys., Inc., 308 F.3d at 1201-02. In light of the plain meaning of the words "around or under said [future] building," as well as the parties' agreement as to the meanings of "around" and "under,"[16] the only word in this claim term that requires special construction is

_____

[16] See supra notes 6, 13.

46

"or." Plaintiffs contend that "around or under said [future] building" means around the building, under the building, or both around and under the building. (Markman Hr'g Tr. (Doc. 118, No. 10CV274; Doc. 148, No. 10CV276) at 18-19.) In other words, Plaintiffs argue that "or" is intended to include "and/or," or at least does not exclude "and/or." Defendants assert that the instant term means around the building or under the building, but not both. (Id. at 94-95, 128.)

There is no dispute that "around" and "under" refer to different treatment locations. (Id. at 48 ("[A]round means exterior. We agree with that. Under means interior, we agree with that.").) Thus, this court finds that "or" in the instant claim term is used in its disjunctive sense, not its explanatory sense.

While this court agrees with Plaintiffs' premise that "or" may occasionally be used to include "and/or," or at least not to exclude "and/or," the court's consideration of "the claims themselves, both asserted and nonasserted," see Vitronics Corp., 90 F.3d at 1582, reveals that Mr. Kimura did not intend to deploy "or" in that sense. In claims of both the '010 patent and the '743 patent, Mr. Kimura explicitly used the term "and/or." (Compl. Ex. B (Doc. 1-3, No. 10CV276) at 6, col. 7, l. 24; id. at 6, col. 8, l. 55; Compl. Ex. C (Doc. 1-4, No. 10CV276) at 6, col. 7, l. 17; id. at 6, col. 8, l. 55.) This demonstrates to this

court that Mr. Kimura knew how to use "and/or" and still chose to teach the application of insecticide "around or under said [future] building" rather than "around and/or under said [future] building." The unmistakable implication is that "around or under said [future] building" means "either around said [future] building or under said [future] building, but not both."

"There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." Tandon Corp. v. U.S. Int'l Trade Comm'n, 831 F.2d 1017, 1023 (Fed. Cir. 1987). Accordingly, this court presumes a difference in meaning and scope between "or" and "and/or." Plaintiffs have attempted to rebut that presumption by once again asserting that "barrier" treatment methods constituted the state of the art at the time of Mr. Kimura's invention and that such methods required treatment of both the interior and the exterior of the building to be protected. (See Pls.' Opening Claim Construction Br. (Doc. 48, No. 10CV276) at 17 (referring the court to Plaintiffs' argument as to the meaning of "along the perimeter of the building").) Again, regardless of whether this is true, the Kimura patents do not teach a barrier treatment method. As discussed in Part III.A, supra, Mr. Kimura disclaimed barrier treatments with sufficient clarity to put those skilled in the art on notice that barrier methods are excluded under the teachings of the Kimura patents.

Reading this claim term in light of the specification, see Markman, 52 F.3d at 979, this court finds no reason to deviate from the plain meaning that is evident in the patent claims. In fact, the specification contains two more explicit uses of the term "and/or" and thus provides further support for this court's finding that Mr. Kimura did not intend "or" to mean "and/or." (Compl. Ex. B (Doc. 1-3, No. 10CV276) at 4, col. 3, l. 29; id. at 4, col. 4, l. 55.) Likewise, there is nothing in the prosecution history, see Markman, 52 F.3d at 980, to dissuade this court from construing the instant term consistently with the plain meaning that is evident in the patent claims. Further, this court finds no ambiguity in the intrinsic record as it relates to the instant term, and therefore finds that consultation of extrinsic evidence is unnecessary. See Vitronics Corp., 90 F.3d at 1583.

For the foregoing reasons, this court concludes that "around or under said [future] building" should be construed as "either around said [future] building or under said [future] building, but not both."

**K.    "the total perimeter of the building"**

Plaintiffs propose that this claim term be construed as "The combination of treated and untreated locations." MANA and CSI propose that this claim term be construed as "the total length of the boundary of the building." Cheminova proposes that this claim term be construed as "The total length of the boundary of

the building." (Joint Pre-Hr'g Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276) at 17.)

This court begins with the claim term itself and the ordinary meaning that would be attributed to these words by a person skilled in the relevant art. Tex. Digital Sys., Inc., 308 F.3d at 1201-02. This claim term appears to require no special construction: the Kimura patents instruct that the combination of treated locations and untreated locations will equal the total length of the boundary of the building. This reading appears to be consistent with the constructions proposed by both Plaintiffs and Defendants. However, the reasoning behind Plaintiffs' construction reveals that Plaintiffs contend that "the total perimeter of the building" equals the combination of the treated locations and untreated locations both around and under the building. (See Markman Hr'g Tr. (Doc. 118, No. 10CV274; Doc. 148, No. 10CV276) at 17.)

In light of the patents' use of the word "total" to modify "perimeter" in this claim term,[17] and to the extent there is ambiguity in the phrase "total perimeter," this court finds the

_____

[17] This court observes that the Kimura patents refer to both "the perimeter of the building" and "the total perimeter of the building." (E.g., Compl. Ex. B (Doc. 1-3, No. 10CV276) at 5, col. 6, ll. 2-3.) Based on the ordinary meanings of the words used, this court finds that "the perimeter of the building" simply refers to the boundary of the building, whereas "the total perimeter of the building" refers to the measure of the boundary of the building, that is, the sum of the lengths of the line segments forming the boundary of the building.

following dictionary definitions of "perimeter" to be useful:
"the boundary of a closed plane figure" and "the sum of the
lengths of the line segments forming a polygon." Webster's Third
New International Dictionary 1680; see also Tex. Digital Sys.,
Inc., 308 F.3d at 1203 ("[I]t is entirely proper for both trial
and appellate judges to consult [dictionaries] at any stage of a
litigation, regardless of whether they have been offered by a
party in evidence or not.").[18] Adjusting these definitions
slightly to achieve "consisten[cy] with the use of the words by
the inventor," see Tex. Digital Sys., Inc., 308 F.3d at 1203,
this court construes "the total perimeter of the building" as
"the sum of the lengths of the line segments forming the boundary
of the building."

By construing the instant claim term as the combination of
the treated locations and untreated locations both around and
under the building, Plaintiffs construe "the total perimeter of
the building" as being twice that sum, that is, twice as long as
the instant term's plain language indicates. Because there is no
evidence in the record to indicate that "the ordinary meaning
that would be attributed to [the instant term] by persons skilled

---

[18] This court finds no evidence that a person of ordinary
skill in the relevant art at the time of Mr. Kimura's invention
would have understood "perimeter" to mean anything other than its
customary, dictionary meanings. Thus, this extrinsic evidence is
not used "for the purpose of varying or contradicting the terms
of the claims." See Markman, 52 F.3d at 981.

in the relevant art" corresponds with Plaintiffs' preferred meaning, see id. at 1202, this court finds that Plaintiffs' construction is inconsistent with the term's ordinary meaning. Further, this court finds that none of the circumstances that justify deviating from a term's ordinary meaning are present with respect to "the total perimeter of the building." Namely, this court finds that Mr. Kimura did not act as his own lexicographer with respect to the instant term, that Mr. Kimura did not distinguish the instant term from prior art, and that the instant term does not "so deprive[] the claim of clarity as to require resort to the other intrinsic evidence for a definite meaning." See CCS Fitness, Inc., 288 F.3d at 1366-67 (internal quotation marks and citations omitted).

Turning back to this court's own construction of the instant term, and reading the term in light of the specification, see Markman, 52 F.3d at 979, this court finds no reason to deviate from the term's plain meaning. Likewise, there is nothing in the prosecution history, see id. at 980, to dissuade this court from construing the instant term consistently with its plain meaning. Moreover, this court finds no further ambiguity in the intrinsic record as it relates to the instant term, and therefore finds that additional consultation of extrinsic evidence is unnecessary. See Vitronics Corp., 90 F.3d at 1583.

For the foregoing reasons, this court concludes that "the total perimeter of the building" should be construed as "the sum of the lengths of the line segments forming the boundary of the building."

## L.    "no repellent action"

Plaintiffs propose that this claim term be construed as "Does not repel insects."  MANA and CSI have not offered a proposed construction of this claim term.  Cheminova proposes that this claim term be construed as "The characteristic of an active ingredient that does not repel an insect when the insect encounters it."  (Joint Pre-Hr'g Statement (Doc. 115, No. 10CV274; Doc. 133, No. 10CV276) at 18.)

This court begins with the claim term itself and the ordinary meaning that would be attributed to these words by a person skilled in the relevant art.  <u>Tex. Digital Sys., Inc.</u>, 308 F.3d at 1201-02.  This claim term appears to require no special construction: the Kimura patents claim a process for applying insecticide, wherein the active ingredient is an insecticide that does not repel the insects.

Reading this claim term in light of the specification, <u>see</u> <u>Markman</u>, 52 F.3d at 979, this court finds no reason to deviate from the term's plain meaning.  Likewise, there is nothing in the prosecution history, <u>see</u> <u>id.</u> at 980, to dissuade this court from construing the instant term consistently with its plain meaning.

Further, this court finds no ambiguity in the instant term to necessitate consultation of extrinsic evidence. <u>See</u> <u>Vitronics</u> <u>Corp.</u>, 90 F.3d at 1583.

For the foregoing reasons, this court concludes that "no repellent action" should be construed as "does not repel the insects."

IV.  CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that the meaning and scope of the patent claim terms presented by the parties for construction are determined as follows:

A.  "Process for the protection of a [future] building against damage caused by insects" is construed as "Process for the protection of a [future] building against damage caused by insects that (a) requires the deliberate creation of untreated locations (i.e., loopholes) through which the crawling insect can reach the building without being exposed to the insecticide and (b) disclaims applying insecticide without loopholes around a [future] building, under a [future] building, and both around a [future] building and under a [future] building";

B.  "insecticidally active ingredient" is construed as "insecticidally active ingredient which is active by contact (contact with species to be killed) and has no

54

repellent effect on the insects, and which has no quick knock down effect and a secondary killing action when used in the claimed solution or suspension";

C.  "no quick knock down effect" is construed as "able to produce an action of killing insects which have not been directly treated by means of the said insecticide";

D.  "secondary killing action" is construed as "an action of killing insects which have not been directly treated by means of the said insecticide";

E.  "forming treated . . . locations" is construed as "applying an effective amount of said solution or suspension to discrete locations";

F.  "forming . . . untreated locations" is construed as "forming locations along the perimeter of the building where the solution or suspension was not applied";

G.  "along the perimeter of the building" and "along the outline of the future building" are construed as "along the boundary of the [future] building";

H.  "an effective amount of said solution or suspension" is construed as "an amount of said solution or suspension that is sufficient to protect a building against damage caused by insects";

I. "discrete locations" is construed as "locations that are separate and distinct from each other such that there remain untreated locations (i.e., loopholes) through which the crawling insect can reach the building without being exposed to the insecticide";

J. "around or under said [future] building" is construed as "either around said [future] building or under said [future] building, but not both";

K. "the total perimeter of the building" is construed as "the sum of the lengths of the line segments forming the boundary of the building";

L. "no repellent action" is construed as "does not repel the insects."

This the ___30___ day of June 2011.

William L. Osteen, Jr.
United States District Judge