# EXHIBIT

# 6

**H**
Only the Westlaw citation is currently available.

United States District Court, E.D. Virginia,
Alexandria Division.
TOUCHCOM, INC., et al., Plaintiffs,
v.
BERRESKIN & PARR, et al., Defendants.

No. 1:07cv114 (JCC).
Oct. 29, 2010.

Daniel Donohoe Prichard, Lynn Marie Deavers, Dow Lohnes & Albertson PLLC, Washington, DC, for Plaintiffs.

Monplaisir Godfrey Hamilton, Shook Hardy & Bacon LLP, Washington, DC, for Defendants.

***MEMORANDUM OPINION***
JAMES C. CACHERIS, District Judge.

***1** This matter comes before the Court on the parties' various motions to strike expert testimony. Plaintiffs Touchcom Incorporated and Touchcom Technologies are suing Defendants Bereskin & Parr ("B & P") and H. Samuel Frost (a partner at B & P) for legal malpractice, alleging that Defendants' failure to include certain portions of source code in obtaining a patent for a gas pump display device, U.S. Patent No. 5,027,282 (the " '282 Patent"), led to the patent being found invalid and unenforceable in an infringement action. Both parties now move to exclude certain expert evidence.

**I. Standard of Review**

Following the Supreme Court's rulings in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and *Kumho Tire Co. v.. Carmichael,* 526 U.S. 137 (1999), Federal Rule of Civil Procedure 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

District Court judges must act as gatekeepers to " 'ensure that any and all scientific testimony ... is not only relevant, but reliable.' " *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir.2001) (quoting *Daubert,* 509 U.S. at 588). To be reliable, expert testimony "must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.,* 190 F.3d 244, 250 (4th Cir.1999) (citing *Daubert,* 509 U.S. at 590, 592-93).

Accordingly, "a trial judge, faced with a proffer of expert scientific testimony, must conduct 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.' " *Cooper,* 259 F .3d at 199 (quoting *Daubert,* 509 U.S. at 592-93). In making this assessment, a district judge should examine the following factors: "(1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Id.* (citing *Daubert,* 509 U .S. at 592-94). This list, however, is "neither definitive [ ] nor exhaustive." *Id.* Rather, the factors listed "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 200.

***2** The gatekeeping requirement is meant "to ensure that the expert witness in question in the courtroom employs the same level of intellectual vigor that characterizes the practice of an expert in the relevant field." *United States v. Barnette,* 211 F.3d 803, 815-16 (4th Cir.2000) (citing *Kumho Tire Co.,* 526 U.S. at 152). At the end of the day, however, a district court's decision with respect to the admissibility of expert scientific testimony "is always a flexible one, and the court's conclusions necessarily amount to an exercise of broad discretion guided by the overarching criteria of relevance and reliability." *Oglesby,* 190 F.3d at 250; *see also Cooper,* 259 F.3d at 200 (noting the Supreme Court's statement in *Kumho Tire* that trial

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

judges “must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable”) (quoting *Kumho Tire,* 526 U.S. at 152); *Barnette,* 211 F.3d at 816 (noting the Fourth Circuit's consistent practice of giving “great deference” to a trial court's *Daubert* ruling).

## II. Analysis

A. *Rollie White*

Plaintiffs object to the introduction of certain testimony of Rollie White. For most of the time between 1975 and 2007, Mr. White worked at Dresser Industries, Inc. (“Dresser”)-the company whose device allegedly infringed the '282 Patent. (White Rep. at 2 ¶ 5.) At various times, he served as General Manager of the Systems Group, Vice President of Sales and Marketing, and Vice President of Software Engineering. *Id.* His primary focus was the “identification, specification, development, marketing, sales, manufacturing, installation, and support of retail fuel dispensing and management control systems in the United States.” (White Rep. at 3.) He also worked directly with Peter Hollidge, the named inventor of the '282 Patent, in negotiating Dresser's rights to practice that patent. *Id.* at TT 42-50. He holds a Bachelor of Arts in Political Science from Davidson College. *Id.* at ¶ 5.

Plaintiffs object to Mr. White's opinions regarding the following: the '282 Patent's value in the marketplace absent a touchscreen; the percentage of Dresser and non-Dresser dispenser card processing terminals (“DCPTs”) installed with Nucleus point-of-sale (“POS”) systems during certain years; and the cost of implementing a design-around dispenser to avoid infringing the '282 Patent. The Court considers each in turn.

i. *The Value of the '282 Patent*

Mr. White states in his report that, “if the '282 Patent did not offer a touch screen ... but merely claimed the use of conventional displays and inputs, ... the '282 patent would have been of little value in the market place as compared with existing technology.” *Id.* at ¶ 10. Plaintiffs raise several objections to this opinion.

First, Plaintiffs argue that Mr. White lacks the specialized knowledge necessary to “opine as to the value of the '282 Patent.” (White Mot. at 7-8. [FN1]) Plaintiffs cite Mr. White's lack of “specialized skills, training, or education relating to patent law, licensing, royalties, or valuation.” *Id.* at 8. Plaintiffs also note that Mr. White did not review the '282 Patent itself, and that he does not recall exactly what that patent purported to cover. *Id.* Plaintiffs cite *Anderson v. Mega Systems, L.L.C.,* No. 03-60190, 2006 Bankr.LEXIS 4682 (E.D.Tex.Bankr.Sept. 14, 2006), which excluded a purported expert's patent valuation where he lacked specialized knowledge in patent valuation and his sole valuation experience related to the patent at hand. *Id.* at *3.

FN1. For the purposes of this Memorandum, motions to strike will be abbreviated “[Expert Name] Mot.,” briefs in opposition will be abbreviated “[Expert Name] Opp.,” and reply briefs will be abbreviated “[Expert Name] Reply.”

***3** The Court disagrees with the notion that Mr. White's opinion equates to a patent valuation. Mr. White does not attach a dollar value to the patent's use of a touchscreen, he simply opines that the touchscreen is what made the device at issue valuable (*i.e.,* novel). The question, then, is whether he should be permitted to offer expert testimony as to that opinion. Absent any argument that that testimony would be irrelevant, the question is whether it is reliable.

Plaintiff argues that Dr. White's conclusions are unreliable because he relies on no methodology for his conclusions besides his experience and background. (White Mot. at 9-10.) Yet the Fourth Circuit permits not only scientific expert testimony but also “experiential expert testimony.” *United States v. Wilson,* 484 F.3d 267, 274 (4th Cir.2007). Such testimony need not “rely on anything like the scientific method.” *Id.* (quoting Fed.R.Evid. 702 advisory committee's note). Rather, to be reliable, the witness must “explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts.” *Id.*

This standard reveals adequate support for Mr. White's opinion. Having been “personally involved in the licensing of the '282 patent and the subsequent attempt to design and implement dispenses with touch screen functionality” (White Rep. at ¶ 6), having worked directly with the Patent's inventor to develop and market the system it claimed (*Id.* at TT 42-50), and having spent 27 years in the business of developing and marketing fuel-dispenser systems (*Id.* at ¶ 5), Mr. White is qualified to opine that the value (in terms of marketability) of the system at issue depended on its inclusion of a touchscreen.

This Court will therefore deny Plaintiffs' motion with respect to this testimony.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ii. *Dresser Dispenser Sales*

Plaintiffs next argue that Mr. White offers improper opinions regarding the percentage of Dresser and non-Dresser DCPTs (dispenser card processing terminals) installed with Dresser's Nucleus POS (point of sale) system. (White Mot. at 13.) Mr. White's report critiques the finding of one of Plaintiff's experts, Christopher Gerardi, who allegedly assumed that all Dresser DCPT dispensers that interfaced with Dresser POS systems used Nucleus POS systems. (White Opp. at 9-10.) Defendants argue that the "key" element of this critique is that Mr. Gerardi "included non-accused products in his damages analysis." *Id.* at 10.

The testimony at issue begins with Mr. White agreeing with Mr. Gerardi regarding the percentages of Dresser DCPT dispensers using various POS systems, including Dresser POS systems. (White Rep. at ¶ 59.) Mr. White goes on to explain, however, that those POS systems were comprised of *both* Wayne Plus/3 *and* Nucleus POS systems (as opposed to all being Nucleus systems). *Id.* He then proceeds to offer, based on his "years of experience in this field and personal knowledge," a series of (rather specific) percentages representing the number of Dresser DCPT systems using Nucleus POS systems for each year from 1997 to 2007. *Id.* Finally, he explains how, based on his experience, he knows that the share of DCPT sites using Nucleus began low but "started to ramp up in 2003." *Id.* at ¶ 60.

***4** Plaintiff argues that this testimony is unreliable speculation and improper expert testimony. With regard to the testimony being unduly speculative, this Court agrees *in part.* Mr. White's experience, as outlined above, renders him qualified to reliably opine that, as *a general matter,* an increasing percentage of Dresser DCPT systems used the Nucleus POS system from 1997 to 2007 (or, in the alternative, that not all Dresser DCPT systems used the Nucleus system). Furthermore, Mr. White posits reasons for this increase in his report. *Id.* at ¶ 60. That testimony is appropriate.

It is inappropriate, however, for Mr. White to opine on the *specific* percentage of Dresser DCPT systems using Nucleus systems. His deposition testimony shows those percentages to be at-best rough estimates, based upon calculations requiring assumptions at nearly every step along the way (*e.g.,* the price of a Nucleus system, the number of Nucleus sales per year, the installation base). The percentages are therefore not sufficiently reliable to qualify as expert testimony.

This Court will therefore grant Plaintiffs' motion solely with respect to testimony as to actual percentages of DCPT systems using Nucleus systems.

iii. *The Cost of a Design-Around*

Plaintiffs object to Mr. White's findings as to the "anticipated cost of designing a non-infringing design-around dispenser" to overcome potential infringement of the '282 Patent. (White Mot. at 15.) Mr. White's findings are based entirely on another of Defendants' experts, Dr. Jack Grimes, who offers several hypothetical design-around options in his expert report. Reviewing Dr. Grimes's report, Mr. White calculated the likely cost of implementing those options. Based on his experience and personal knowledge, he provided estimates as to the likely costs to Dresser of paying software developers during the time periods at issue, finding that "Dresser would not have experienced lost sales or market position associated with any delay required by implementing the design-around suggested by Dr. Grimes." (White Rep. at TT 62-63.)

Plaintiff argues that Mr. White lacks personal knowledge as to whether a design around was possible to begin with. The Court finds this largely beside the point, as Mr. White's calculations simply compute the likely cost of Dr. Grimes's suggested designs, whether or not they would actually work. Mr. White's experience at Dresser-particularly as a former Vice President of Software Engineering and of sales and marketing-puts him in a position to offer this testimony based on his personal knowledge.

This Court will therefore deny Plaintiffs' motion with respect to this testimony.

B. *Dr. Jack Grimes*

To recover damages in this case, Plaintiffs must prove that, but for Defendants' negligence, they would have prevailed in their infringement suit against Dresser. Defendants argue that the Dresser device did not infringe the '282 Patent, thus precluding infringement. The '282 Patent contains both hardware and software components. Defendants retained Dr. Grimes to offer opinions regarding the software. (Grimes Opp. at 4.) Plaintiffs now challenge three of his opinions: first, his use of the term "connected to"; second, his use of the term "control"; and third, his opinion on inventorship of the ' 282 Patent.

i. *Use of the Terms "Connected to" and "Control"*

***5** Plaintiffs argue that Dr. Grimes violated this Court's *Markman* ruling with respect to the term "con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

nected to," by opining that that term is not implicated by the Dresser device because the connection at issue in that device has an "intervening operation." Similarly, Plaintiffs also argue that Dr. Grimes improperly opined that the term "control," as stated in the '282 Patent, refers to "direct hardware control through associated electronics." (Grimes Mot. at 5 (quoting Grimes Dep.at 93:14-17).) In essence, both claims argue that Dr. Grimes violates this Court's *Markman* rulings by assigning special meanings to terms this Court defines by their plain and ordinary meanings.

The purpose of the *Markman* hearing was to address the construction of various terms left undefined in the previous Dresser litigation. Following that hearing, this Court declined to adopt a series of Defendants' proposed definitions, including two relevant here. First, Defendants proposed that the term "connected" be construed as "joined together by a communications path without intervening operation." Second, Defendants proposed that the term "control" be construed to mean "command."

Considering these requests, in addition to others made by both Plaintiffs and Defendants, this Court held that "[a]ll of the parties' proposed constructions simply add a layer of complexity and confusion to an already intricate matter for the jury," and found that "the plain and ordinary meaning of these terms is the proper construction here." *Touchcom (Markman Op.*) at 18-19. Plaintiffs now argue that Dr. Grimes advances "special" interpretations of these terms that violate the Court's *Markman* finding.

With regard to the term "connected to," Dr. Grimes concludes that the Dresser system's display is not connected to the [Central Processing Unit ("CPU") ] because the display "is isolated ... by the [Computer Activated Terminal ("CAT") ] computer," and he reaches a similar conclusion with respect to the pump means. (Grimes Rep. at 4.) Plaintiffs allege that Dr. Grimes's reference to an intervening operation as the reason these elements were not "connected to" each other is "the very construction that was rejected by the Court [at the *Markman* hearing]." (Grimes Mot. at 4.)

Likewise with the term "control," Plaintiffs allege that Dr. Grimes improperly states that " 'control' must be 'direct hardware control through associated electronics,' " as opposed to being defined by its plain and ordinary meaning. *Id.* at 5.

Both of Plaintiffs' arguments overstate this Court's *Markman* decision. This Court, at the *Markman* Hearing, did not reject the notion that certain terms, like "connected to" and "control," *might* validly be described in the manner suggested at that time by the parties (in this case, the Defendants). This Court did not find the parties' proposed definitions inaccurate or inconsistent with the terms' plain and ordinary meaning. Indeed, this Court made no findings as to the meaning of these terms. Rather, to avoid "simply add[ing] a later of complexity and confusion to an already intricate matter," this Court simply chose not to adopt any *additional* definitions of these terms-*on top of* their ordinary meaning-as *the* operative constructions for this case going forward. *Touchcom (Markman Op.*) at 18-19 [ Dkt. 153].

***6** These terms' ordinary and customary meaning is the meaning they "would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed.Cir.2005) (en banc). "Such a person is deemed to read the words used in the patent documents with an understanding of their meaning in the field." *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1477 (Fed.Cir.1998). And an order limiting claim terms to their plain and ordinary meaning does not preclude the Court from determining this meaning based on both intrinsic evidence (including the language of the claim) and extrinsic evidence, "which may include expert testimony." *See L .B. Plastics, Inc. v. Amerimax Home Products, Inc.,* 499 F.3d 1303, 1308 (Fed.Cir.2007).

It is therefore permissible for Dr. Grimes to opine as to the plain and ordinary meaning of these terms. This Court will therefore deny Plaintiffs' motion to limit this testimony.

ii. *Opinions Regarding Inventorship*

Plaintiff additionally moves to preclude Dr. Grimes from testifying regarding inventorship of the '282 Patent. At issue is a dispute over whether Peter Hollidge was the Patent's sole inventor or whether Steven Bond should be credited as a joint inventor. Dr. Grimes concluded in his "Invalidity Report" that Mr. Bond made a more significant contribution to the system than a "simpl [e] reduction to practice of Mr. Hollidge's broader concept." (Grimes Resp. at 12 (citing Grimes Invalidity Report ¶ 89 (attached as Exhibit G to Grimes Mot.)).) Plaintiff argues that this opinion is based "only" upon Mr. Hollidge and Mr. Bond's deposition transcripts, and that as a result, Dr. Grimes's opinion is an improper judgment as to their credibility. (Grimes Mot. at 6)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Expert witnesses are not permitted to opine as to witness credibility. *United States v. Dorsey,* 45 F.3d 809, 815 (4th Cir.1995). It is therefore impermissible for Dr. Grimes to opine as to whether Mr. Hollidge or Mr. Bond is more credible-something Dr. Grimes apparently did during his deposition. (Grimes Dep. At 52:8-55:1.) This Court will preclude him from doing so at trial.

Yet, the Court disagrees with the notion that, because Dr. Grimes made this judgement when asked to make it at his deposition, *the entirety* of his opinion as to inventorship is one of credibility and is therefore inadmissible. His expert report indicates otherwise. It shows Dr. Grimes considering several objective indicators that Mr. Bond played a significant role in designing the system, including: Mr. Hollidge and Mr. Bond's respective computer programming backgrounds, Mr. Bond's having written all of the non-third-party-generated source code for Schedules A and B of the patent, and Mr. Hollidge's opinion that the '282 Patent must run on an operating system that allegedly could not support concurrent operations as envisioned by the patent. (Grimes Invalidity Report at TT 82-89.)

***7** As a result, this Court cannot agree that Dr. Grimes "bases his opinion on *nothing more* than his personal assessment of witness credibility." (*See* Grimes Mot. at 12 (emphasis added).) More importantly, there is no basis for concluding that Dr. Grimes's improper credibility judgment supported any aspect of his overall finding (as opposed to simply following from it). Absent evidence of such impropriety, this Court will not preclude his overall opinion regarding inventorship.

C. *Ronald Santicola*

Plaintiffs have retained Ronald Santicola to provide expert opinions regarding whether the accused Dresser systems infringe Claim 1 of the '282 Patent. Defendants take issue with four aspects of Mr. Santicola's expert opinion, arguing that each renders his overall opinion unreliable: his opinions regarding the transfer of input responses to the CPU; his opinions regarding the identification of the alleged CPU; his opinions regarding how input responses are processed on the CPU; and his opinions regarding transmission of transaction data.

At bottom, these issues turn on the question of whether Mr. Santicola's admitted lack of *software* expertise prevents his reliably reaching certain opinions regarding *hardware.* Plaintiffs argue that the '282 Patent encompasses two distinct technological fields: the "Interactive Fuel Dispenser Field" and the "Computer Software Field". (Santicola Resp. at 1.) Mr. Santicola is Plaintiffs' expert as to the first field, not the second. He admits that he is not an expert in communications between software modules, connections between hardware and software, computer processing, and software architecture. (Santicola Dep. at 35:17-36:14.) The question is whether his lack of *software* expertise should preclude his offering certain opinions as to Claim 1.

Plaintiffs submit the following breakdown of elements listed under Claim 1, and argue that Mr. Santicola is properly considered an expert for Elements 1-7, which allegedly involve hardware, and not Element 8, which allegedly involves software. (Santicola Resp. at 6.) Defendants argue that this oversimplifies things and that Elements 1-7 involve both hardware and software. (Santicola Reply at 2).

| | CLAIM ONE |
|---|---|
| Element 1 | An interactive pump system capable of interacting with and responding to responses from a user, the system comprising; |
| Element 2 | a pump means; |
| Element 3 | a central processing unit connected to the pump means; and |
| Element 4 | a display and input means including a plurality of instruction displays, and being connected to the pump means and the central processing unit; |
| Element 5 | wherein the pump means is operable to transmit transaction data, concerning fluid pumped, to the display and input means which will display the transaction data, display one instruction display, and |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

| | |
|---|---|
| Element 6 | transfer input responses from a user to the central processing unit, |
| Element 7 | the central processing unit being operable to process the input responses and to control the pump means according to the responses, |
| Element 8 | characterized in that the central processing unit includes pump task means, display and input task means and application task means, each task means, in operation running concurrently with the other task means, with the pump task means controlling the pump means, the display and input task means controlling the display and input means, and the application task means receiving and processing the input responses and transferring results into pump directions to the pump task means. |

i. *Opinions Regarding Transfer of Input Responses to the CPU*

***8** Defendants first argue that, in opining that the Dresser systems "transfer input responses from a user to the central processing unit" and therefore overlap with Claim 1, Mr. Santicola fails to note the difference between "input responses" and "input requests ." (Santicola Mot. at 10 (quoting Santicola Report TT 83-86 & Supplemental Santicola Report TT 81-84).) Hardware-to-software communications are "responses" and software-to-software communications are "requests." (Santicola Reply at 5.) Defendants argue that the Dresser systems use both input responses (here, signals sent from input keys to the CAT) and input requests (here, signals sent by the CAT to the point-of-sale ("POS") CPU). (Santicola Reply at 6.)

Plaintiffs respond that Mr. Santicola's analysis is properly limited to "input responses," because the term "input requests" appears only under Claims 2 and 3 (and not at all in Count 1), which Mr. Santicola did not analyze. Santicola Opp. at 11.) Defendants argue that, because terms are given the same meaning across patent claims, Mr. Santicola's analysis as to input responses is necessarily incomplete and unreliable. (Santicola Reply at 7.) While this may be true, it does not, in this Court's view, render Mr. Santicola's conclusion so unreliable as to warrant exclusion.

"A court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. As with all other admissible evidence, expert testimony is subject to being tested by vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof." *Westberry v. Gislaved Gummy AG,* 178 F.3d 257, 261 (4th Cir.1995) (internal citations and quotation marks omitted). This Court is confident that Mr. Santicola's conclusion will be so tested and finds, therefore, that this issue goes to its weight, not its admissibility.

ii. *Opinions Regarding the Accused CPU*

Defendants next take issue with Mr. Santicola's conclusion that, in the Dresser systems, input responses are transferred to "the CPU," thus violating Element 6 of the '282 Patent, which also claims the use of a single CPU. (Santicola Mot. at 12) The '282 Patent uses a single CPU to receive and process input responses. (Santicola Reply at 7.) The Dresser systems, however, allegedly used POS systems that come in three varieties, two of which use multiple CPUs. (*Id.* at 7-8.) Defendants argue that, with respect to the POS systems that use more than one CPU, Mr. Santicola failed to investigate how responsibilities between those CPUs are apportioned, thus rendering unreliable Mr. Santicola's opinion regarding Element 6. (Santicola Mot. at 13.)

Plaintiffs respond that Defendants' challenge is only relevant to the minority of Dresser systems that use multiple CPUs. (Santicola Resp. at 12.) As for the multiple-CPU systems, Plaintiffs list materials referenced by Mr. Santicola in determining that the "Sapphire CPU" receives input responses and controls the interactive dispensing system, including a user manual, a system sales reference, and deposition testimony from the third-party manufacturers of the POS systems. (*Id.*) Defendants argue that nothing within this material establishes that the Sapphire CPU actually receives and processes input responses, as opposed to simply being "connected to" the fuel dispenser. (Santicola Reply at 8.)

***9** If true, this may call into question Mr. Santicola's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

conclusions for the limited number of Dresser systems using multiple CPUs. But it does not so undermine those conclusions as to call for exclusion, meaning that this too is an issue of weight, not admissibility. Defendants will be welcome to present evidence challenging Mr. Santicola's likening of being “connected to” a fuel dispenser with receiving and processing input responses.

iii. *Opinions Regarding How the CPU Processes Input Responses*

Defendants next argue that Mr. Santicola improperly opines that the Dresser systems implicate Element 7-“the [CPU] *being operable* to process the input responses and to control the pump means according to the responses”-without analyzing the relevant software operations behind this process. See Part III, C, supra (emphasis added). Defendants claim that, to establish Element 7, Mr. Santicola should have traced input responses through the CPU software “to ensure that any pump control is the actual result of the alleged ‘input response.’ “ (Santicola Reply at 10.) Plaintiffs argue that such software analysis is unnecessary, that Element 7 merely requires that the CPU be “operable” to process input responses, meaning that the manner of that process is irrelevant.

The Court agrees. To the extent it may be theoretically possible that an analysis tracing input responses through the software might call for a different conclusion than Mr. Santicola's “operational” observations, that lack of analysis does not render his conclusion so unreliable as to warrant exclusion.

iv. *Opinions Regarding Transmission of Transaction Data*

Similarly, Defendants object to Mr. Santicola's opinion that the Dresser system's pump means is “operable to transmit transaction data ... to the display and input means,” as required by Element 5, again arguing that Mr. Santicola improperly makes that claim without knowing or analyzing the process involved. That process, Defendants argue, can only be understood by tracing transaction data from the pump means to the display, including such technical elements as the possibility that the messages are created by software on the computer controlling the CAT display, the type of communication protocol used to transmit data, and the pump computer (*i.e.,* the “iGEM”), and its role in transmission of transaction data. (Santicola Mot. at 17.)

As with Element 7, Plaintiffs argue that Element 5 requires no such analysis, because it only requires that the pump means be “operable” to transmit data, not that the transmission occur in some specific manner. The Court again here agrees that while the technical process behind the transmission might call into question Mr. Santicola's conclusions, his failure to analyze them does not so undermine his conclusions as to render them outright inadmissible. Defendants' arguments are best addressed to weight, not admissibility.

* * *

***10** In short, it is an open question to the Court whether, for *any* of the elements, infringement (or the lack thereof) can be determined through “operational analysis” alone. The Court will consider this a question of weight, not admissibility, however, and will not exclude Mr. Santicola's analysis at this time.

D. *The Beazley Rebuttal*

Defendants move to strike as untimely a rebuttal report submitted by Dr. David Beazley on July 16, 2010. Defendants argue that, because Plaintiffs bear the burden to prove that the '282 Patent was not invalid, Dr. Beazley's initial report (and not his rebuttal) should have set out his arguments to that effect. At issue are Dr. Beazley's findings that the '282 Patent does not ensnare the prior art. Following Dr. Grimes's report, in which Dr. Grimes listed a series of patents that, he claimed, disclose every limitation of the '282 Patent, Dr. Beazley's rebuttal report addressed each earlier patent and set forth an argument why it was not ensnared by the '282 Patent. Defendants argue that “the invalidity contentions [Dr. Beazley] responded to were all included in material Plaintiffs had received before Defendants served Dr. Grimes's report,” and therefore should have been addressed in Dr. Beazley's opening report. (*See* Santicola Reply at 16.)

This Court disagrees. Even if Dr. Beazley could have anticipated Dr. Grimes's precise ensnarement argument, this Court declines to require that he affirmatively respond to it ahead of time. Therefore, because the deadline for rebuttal expert reports was set for July 16, 2010, and because Dr. Beazley submitted his rebuttal report on that date, this Court will deny Defendant's motion to strike the Beazley Rebuttal Report.

## III. Conclusion

For the reasons explained above, the Court will deny the parties' motions except as set forth above. An appropriate order will issue.

E.D.Va.,2010.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Touchcom, Inc. v. Berreskin & Parr
Slip Copy, 2010 WL 4393282 (E.D.Va.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.