```
                                    )
BASF AGRO B.V., ARNHEM (NL),        )
WADENSWIL BRANCH, et al.            )
                                    )
       Plaintiffs,                  )
                                    )
       v.                           )       1:10CV274
                                    )
CHEMINOVA, INC.                     )
                                    )
       Defendant.                   )
```

## MEMORANDUM OPINION AND ORDER

OSTEEN, JR., District Judge

Presently before the court are numerous briefs and exhibits with respect to claim construction for claim terms at issue in this case. The parties presented a tutorial to the court regarding the subject matter of the disputed terms on June 20, 2011, and a claim construction hearing ("Markman Hearing") was held on June 21, 2011. This court has considered the evidence in the record, the parties' arguments, and the relevant law, and for the reasons stated herein, this court construes the disputed claim terms as follows:

A.  "in the presence of" is construed as "in the same place as, in the vicinity of, or in the area immediately near";

1

B.     "compound" is construed as "a substance whose molecules

       consist of atoms of different elements.  The elements

       cannot be separated by physical means";

C.     "corrosion inhibiting compound" is construed as "a

       compound that slows, interferes with, or prevents the

       action, process, or effect of eating away or

       diminishing that results from an acid or alkali

       reaction or a chemical alteration."

## I.    BACKGROUND

This patent infringement action was brought by Plaintiffs

BASF Agro B.V., Arnhem (NL), Wädenswil Branch ("BASF") and Bayer

S.A.S. ("Bayer").  Intervenor Plaintiff Merial Limited has joined

with BASF and Bayer.[1]  Plaintiffs allege that Defendant

Cheminova, Inc. ("Defendant" or "Cheminova") will infringe United

States Patent No. 6,620,943 ("the '943 patent" or "the

manufacturing patent"), in violation of 35 U.S.C. § 271.[2]  The

---

[1] In the interest of simplicity, this court will herein
refer to BASF, Bayer, and Merial Limited collectively as
"Plaintiffs."

[2] Plaintiffs also allege that Cheminova will infringe United
States Patent Nos. 6,414,010 ("the '010 patent") and 6,835,743
("the '743 patent").  This court has construed the disputed claim
terms of the '010 patent and the '743 patent in a separate order
(Doc. 151).
    Originally, Plaintiffs alleged that Cheminova would also
infringe another manufacturing patent, United States Patent No.
6,881,848 ("the '848 patent").  However, Plaintiffs have
abandoned their claims for relief as to the '848 patent, and the
only manufacturing patent that Plaintiffs continue to assert is
the '943 patent.  (Pls.' Supplemental Claim Construction Br.

'943 patent teaches the preparation of certain compounds using a method that addresses the problem of corrosion of the industrial reaction vessels in which such compounds are prepared.  (See Compl. Ex. C (Doc. 1-4) at 3, col. 1, ll. 49-60.)[3]

Plaintiffs assert that Defendant's intended method of preparing the insecticidal compound Fipronil will infringe claims 14 and 22 of the '943 patent.  (See June 21, 2011 Markman Hr'g Tr. (Doc. 162) at 12.)  Claims 14 and 22 depend from claim 2 of the '943 patent, which in turn depends from claim 1.  (Compl. Ex. C (Doc. 1-4) at 8, col. 11, l. 62; id. at 8, col. 12, l. 19; id. at 8, col. 11, l. 30.)  Claim 1 contains the following phrase, which contains all the disputed terms of the '943 patent: "in the presence of a corrosion inhibiting compound."  (Id. at 8, col. 11, ll. 28-29.)

## II.  APPLICABLE LAW

In Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), the Supreme Court clarified which issues in a patent trial are properly reserved for the jury, and which are questions of law to be determined by the court.  Specifically, the Court held that interpretation of language in patent claims "is an

_____

(Doc. 132) at 7 n.4.)
Thus, the instant order concerns only the disputed terms of the '943 patent.

[3] All citations in this order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

issue for the judge, not the jury." <u>Id.</u> at 391. The Federal
Circuit has provided further guidance on how to interpret patent
claims, stating that, in general, courts are to give the words of
a claim "their ordinary and customary meaning" as understood by
"a person of ordinary skill in the art in question at the time of
the invention." <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312-13
(Fed. Cir. 2005) (en banc) (internal quotation marks and
citations omitted).

Claim construction proceeds by established rules. A court
should "[f]irst . . . look to the words of the claims themselves,
both asserted and nonasserted, to define the scope of the
patented invention." <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90
F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted). "In
construing claims, the analytical focus must begin and remain
centered on the language of the claims themselves . . . ." <u>Tex.
Digital Sys., Inc. v. Telegenix, Inc.</u>, 308 F.3d 1193, 1201 (Fed.
Cir. 2002) (internal quotation marks and citation omitted).

> Consulting the written description and prosecution
> history as a threshold step in the claim construction
> process, before any effort is made to discern the
> ordinary and customary meanings attributed to the words
> themselves, invites a violation of [Federal Circuit]
> precedent counseling against importing limitations into
> the claims. For example, if an invention is disclosed
> in the written description in only one exemplary form
> or in only one embodiment, the risk of starting with
> the intrinsic record is that the single form or
> embodiment so disclosed will be read to require that
> the claim terms be limited to that single form or
> embodiment. . . . But if the meaning of the words
> themselves would not have been understood to persons of

skill in the art to be limited only to the examples or
embodiments described in the specification, reading the
words in such a confined way would mandate the wrong
result and would violate [the Federal Circuit's]
proscription of not reading limitations from the
specification into the claims.

Id. at 1204-05 (citations omitted).  There is a "heavy

presumption" that the terms in the claims "mean what they say and

have the ordinary meaning that would be attributed to those words

by persons skilled in the relevant art."  Id. at 1202 (internal

quotation marks and citations omitted); see also CCS Fitness,

Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002)

("Generally speaking, we indulge a 'heavy presumption' that a

claim term carries its ordinary and customary meaning."

(citations omitted)).

       The second step in the claim construction process is to look

to the specification, which "contains a written description of

the invention that must enable one of ordinary skill in the art

to make and use the invention."  See Markman v. Westview

Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc),

aff'd, 517 U.S. 370 (1996); see also Vitronics Corp., 90 F.3d at

1582.  "Claims must be read in view of the specification, of

which they are a part."  Markman, 52 F.3d at 979 (citations

omitted).  The claims define the invention, but "the

specification is always highly relevant to the claim construction

analysis.  Usually, it is dispositive; it is the single best

guide to the meaning of a disputed term."  Phillips, 415 F.3d at

1315 (internal quotation marks and citation omitted). "For claim

construction purposes, the description may act as a sort of

dictionary, which explains the invention and may define terms

used in the claims." Markman, 52 F.3d at 979 (citation omitted).

"[A] patentee is free to be his own lexicographer[, but] any

special definition given to a word must be clearly defined in the

specification." Id. at 980 (citations omitted). "[C]laims are

not to be interpreted by adding limitations appearing only in the

specification. . . . [P]articular embodiments appearing in a

specification will not be read into the claims when the claim

language is broader than such embodiments." Electro Med. Sys.,

S.A. v. Cooper Life Scis., Inc., 34 F.3d 1048, 1054 (Fed. Cir.

1994) (citations omitted). A limitation from the specification

should only be read into the claims when the specification

requires that limitation. See id. (citation omitted).

The prosecution history, if it is in evidence, is the third

type of intrinsic evidence to consult. See Markman, 52 F.3d at

980 (citation omitted); see also Vitronics Corp., 90 F.3d at 1582

(citations omitted). "This undisputed public record of

proceedings in the Patent and Trademark Office is of primary

significance in understanding the claims." Markman, 52 F.3d at

980 (internal quotation marks and citation omitted). "The

prosecution history limits the interpretation of claim terms so

as to exclude any interpretation that was disclaimed during

prosecution. Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995) (citations omitted).

The presumption that claim terms have the ordinary meaning that would be attributed to those terms by persons skilled in the relevant art may be rebutted in three situations relevant here.

> First, the claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history. Second, a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention.
> Third, . . . a claim term also will not have its ordinary meaning if the term chosen by the patentee so deprives the claim of clarity as to require resort to the other intrinsic evidence for a definite meaning.

CCS Fitness, Inc., 288 F.3d at 1366-67 (internal quotation marks, alteration, and citations omitted).

The redefinition of a claim term must be clear "so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc., 262 F.3d 1258, 1268 (Fed. Cir. 2001) (citations omitted). However, redefinition need not be explicit. Id. "[T]he specification may define claim terms by implication such that the meaning may be found in or

ascertained by a reading of the patent documents." <u>Id.</u> (internal quotation marks and citation omitted).

Evidence from sources other than the claims, the specification, and the prosecution history is extrinsic and generally should be relied upon only when the intrinsic evidence fails to resolve any ambiguity in a disputed term. <u>See Vitronics Corp.</u>, 90 F.3d at 1583. Extrinsic evidence includes "expert and inventor testimony, dictionaries, and learned treatises." <u>Markman</u>, 52 F.3d at 980. A court may use extrinsic evidence to aid its understanding of a patent, but "not for the purpose of varying or contradicting the terms of the claims." <u>Id.</u> at 981 (citations omitted). Accordingly, the Federal Circuit has stated that "expert testimony, whether it be of an attorney, a technical expert, or the inventor, on the proper construction of a disputed claim term . . . . may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms." <u>Vitronics Corp.</u>, 90 F.3d at 1585 (emphasis omitted).

In such "rare instances," prior art documents and dictionaries are preferable to expert testimony because they are objective, reliable, and "accessible to the public in advance of litigation." <u>Id.</u>

> Dictionaries, encyclopedias and treatises, publicly
> available at the time the patent is issued, are
> objective resources that serve as reliable sources of
> information on the established meanings that would have

been attributed to the terms of the claims by those of
skill in the art. Such references are unbiased
reflections of common understanding not influenced by
expert testimony or events subsequent to the fixing of
the intrinsic record by the grant of the patent, not
colored by the motives of the parties, and not inspired
by litigation. Indeed, these materials may be the most
meaningful sources of information to aid judges in
better understanding both the technology and the
terminology used by those skilled in the art to
describe the technology.

Tex. Digital Sys., Inc., 308 F.3d at 1202-03. Thus, "it is

entirely proper for both trial and appellate judges to consult

these materials at any stage of a litigation, regardless of

whether they have been offered by a party in evidence or not."

Id. at 1203. "Because words often have multiple dictionary

definitions, some having no relation to the claimed invention,

the intrinsic record must always be consulted to identify which

of the different possible dictionary meanings of the claim terms

in issue is most consistent with the use of the words by the

inventor." Id. (citations omitted).

## III. CONSTRUCTION OF THE DISPUTED CLAIM TERMS

### A. "in the presence of"

Plaintiffs propose that this claim term be construed as "The

corrosion inhibiting compound is present during the claimed

oxidation process." Defendant proposes that this claim term be

construed as "Available in the reaction medium or takes part in

the reaction." (Joint Pre-Hr'g Statement (Doc. 141) at 4.)

This court begins with the claim term itself and the ordinary meaning that would be attributed to these words by a person skilled in the relevant art.  <u>Tex. Digital Sys., Inc.</u>, 308 F.3d at 1201-02.  This claim term appears on its face to be self-explanatory and in need of no special construction.  To the extent there is ambiguity in the word "presence," this court finds the following dictionary definitions of that word to be useful: "the state of being in front of or in the same place as someone or something" and "the vicinity of or the area immediately near one."  <u>Webster's Third New International Dictionary</u> 1793 (1986); <u>see also</u> <u>Tex. Digital Sys., Inc.</u>, 308 F.3d at 1203 ("[I]t is entirely proper for both trial and appellate judges to consult [dictionaries] at any stage of a litigation, regardless of whether they have been offered by a party in evidence or not.").[4]  Based on these dictionary definitions, this court finds that a person skilled in the relevant art would have understood "in the presence of" to mean "in the same place as, in the vicinity of, or in the area immediately near."

_____

[4] This court finds no intrinsic or unbiased evidence to suggest that a person of ordinary skill in the relevant art at the time of the invention would have understood "presence" to mean anything other than its customary, dictionary meanings. Thus, these extrinsic definitions are not used "for the purpose of varying or contradicting the terms of the claims."  <u>See Markman</u>, 52 F.3d at 981.

Reading this claim term in light of the '943 patent's specification, see Markman, 52 F.3d at 979, this court finds no reason to deviate from the term's plain meaning. Moreover, this court finds no further ambiguity in the intrinsic record as it relates to the instant term, and therefore finds that additional consultation of extrinsic evidence is unnecessary. See Vitronics Corp., 90 F.3d at 1583.

By proposing that this claim term be construed as "Available in the reaction medium or takes part in the reaction," Defendant advocates a construction that is more limited than the term's plain meaning. However, this court finds that none of the circumstances that justify deviating from a term's ordinary meaning are present with respect to "in the presence of." Namely, this court finds that the patentees did not act as their own lexicographer with respect to the instant term, that the patentees did not distinguish the instant term from prior art, and that the instant term does not "so deprive[] the claim of clarity as to require resort to the other intrinsic evidence for a definite meaning." See CCS Fitness, Inc., 288 F.3d at 1366-67 (internal quotation marks and citations omitted).

Defendant contends that the patentees set forth a definition of "in the presence of" in the '943 patent's specification that is in accordance with Defendant's proposed construction of the instant term. Specifically, Defendant argues that the following

11

specification language serves to define "in the presence of" for purposes of the '943 patent: "It has now been found that the addition of a corrosion inhibiting compound such as boric acid to the reaction mixture inhibits the corrosion process . . . ." (See Compl. Ex. C (Doc. 1-4) at 3, col. 1, ll. 57-59.) However, this court finds that the foregoing language, as well as other similar specification language cited by Defendant, fails to clearly redefine the instant term "so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." See Bell Atl. Network Servs., Inc., 262 F.3d at 1268. Rather, this court finds that the language cited by Defendant merely sets forth an embodiment of the invention and that the language of the actual claim is broader than that embodiment. Thus, this court declines to read Defendant's proposed limitations into the claim language. See Electro Med. Sys., S.A., 34 F.3d at 1054 ("[C]laims are not to be interpreted by adding limitations appearing only in the specification. . . . [P]articular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." (citations omitted)).

Further, this court finds that the only evidence that directly supports reading Defendant's proposed limitations into the instant term is extrinsic evidence that was inspired by the present litigation. (See Joint Pre-Hr'g Statement (Doc. 141) at

12

4.)  See also Tex. Digital Sys., Inc., 308 F.3d at 1202-03.  As

such, the evidence in support of Defendant's construction is

disfavored as compared to the objective dictionary definitions

cited above.  Vitronics Corp., 90 F.3d at 1585.  This court also

notes that Dr. Mark Lipton ("Dr. Lipton"), an expert witness for

Defendant, has admitted that "in the presence of" can be used in

the field of chemistry in a sense that excludes Defendant's

proposed limitations.  (Lipton Dep. Tr. pt. 2 (Doc. 132-5) at 8-

9.)

For the foregoing reasons, this court concludes that "in the

presence of" should be construed as "in the same place as, in the

vicinity of, or in the area immediately near."

**B.    "compound"**

Plaintiffs propose that this claim term be construed as "A

substance whose molecules consist of unlike atoms and whose

constituents cannot be separated by physical means."  Defendant

proposes that this claim term be construed as "One or more of the

same molecule that each have the same molecular structure with

elements in fixed proportion."  (Joint Pre-Hr'g Statement (Doc.

141) at 2.)

This court begins with the claim term itself and the

ordinary meaning that would be attributed to these words by a

person skilled in the relevant art.  Tex. Digital Sys., Inc., 308

F.3d at 1201-02.  Because "compound" is a word that has a

specialized meaning in the field of chemistry, this court looks to science dictionaries for guidance in construing the instant term. See id. at 1203 ("[I]t is entirely proper for both trial and appellate judges to consult [dictionaries] at any stage of a litigation, regardless of whether they have been offered by a party in evidence or not."). One such dictionary defines "compound" as "A substance whose molecules consist of unlike atoms and whose constituents cannot be separated by physical means." McGraw-Hill Dictionary of Chemistry 89 (1997). (See also App. Pls.' Opening Claim Construction Br. Ex. 25 (Doc. 69-25) at 4.) Another science dictionary defines "compound" as "A substance consisting of atoms or ions of two or more different elements in definite proportions joined by chemical bonds into a molecule. The elements cannot be separated physically." The American Heritage Science Dictionary 136 (2005). (See also App. Pls.' Opening Claim Construction Br. Ex. 32 (Doc. 69-32) at 5.)[5]

There is tension between these definitions because only one of them includes the limitation that the elements that make up the molecules must be in definite proportions. This court must determine which of the definitions "is most consistent with the

_____

[5] This court finds no intrinsic or unbiased evidence to suggest that a person of ordinary skill in the relevant art at the time of the invention would have understood "compound" to mean anything other than its customary, dictionary meanings. Thus, these extrinsic definitions are not used "for the purpose of varying or contradicting the terms of the claims." See Markman, 52 F.3d at 981.

14

use of the words by the inventor." See Tex. Digital Sys., Inc., 308 F.3d at 1203. Plaintiffs' proposed construction omits the "elements in definite proportions" limitation. In support of this omission, Plaintiffs note that the '943 patent's specification discloses silica oil as an embodiment of a type of "compound." (See Compl. Ex. C (Doc. 1-4) at 4, col. 4, ll. 63-66.) There is no dispute that silica oil is a "polymer," which is defined as "A substance having large molecules consisting of repeated units (the monomers)." See Oxford Dictionary of Chemistry 428 (6th ed. 2008). (See also June 21, 2011 Markman Hr'g Tr. (Doc. 162) at 65.) There is likewise no dispute that silica oil can exist in the form of a "copolymer," which is a polymer that is made up of different monomers. (See June 21, 2011 Markman Hr'g Tr. (Doc. 162) at 55-56; Winkler Decl. (Doc. 78-5) ¶¶ 38-39.) Defendant also does not contest Plaintiffs' assertions that different molecules of a copolymer "will have different numbers of those [different] monomers," (June 21, 2011 Markman Hr'g Tr. (Doc. 162) at 56), and that a copolymer "will not necessarily consist only of molecules made up of elements present in fixed proportions, if the ratio of the different types of monomer units in the[] copolymer[] is not constant," (Winkler Decl. (Doc. 78-5) ¶ 38).

Based on Plaintiffs' unchallenged evidence, this court finds that the proportion of the different monomer units in a copolymer

can vary among different molecules of that copolymer. Thus, this court finds that the overall proportion of the monomers' constituent elements can likewise vary among different molecules of the same copolymer. According to the evidence before this court, silica oil does not necessarily consist of elements in definite proportions because it can exist in the form of a copolymer. A construction of "compound" requiring that the elements must be in definite proportions could therefore exclude some forms of silica oil. Such a construction by this court would conflict with the apparent intent of the patentees, as the '943 patent's specification explicitly discloses silica oil, without limitation, as an embodiment of a "compound." (Compl. Ex. C (Doc. 1-4) at 4, col. 4, ll. 63-66.) Thus, this court finds that the "elements in definite proportions" limitation should not be included in its construction of the instant term. See Oatey Co. v. IPS Corp., 514 F.3d 1271, 1276 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification." (citations omitted)). Based on the foregoing, this court finds that a person skilled in the relevant art would have understood "compound" to mean "a substance whose molecules consist of atoms

of different elements.  The elements cannot be separated by physical means."[6]

Continuing to read this claim term in light of the '943 patent's specification, <u>see</u> <u>Markman</u>, 52 F.3d at 979, this court finds no reason to deviate from the term's plain meaning as found above.  Moreover, this court finds no further ambiguity in the intrinsic record as it relates to the instant term, and therefore finds that additional consultation of extrinsic evidence is unnecessary.  <u>See</u> <u>Vitronics Corp.</u>, 90 F.3d at 1583.

Defendant's proposed construction of the instant term omits the limitation that a compound's molecules must consist of atoms of different elements, as well as the limitation that the elements cannot be separated by physical means.  Further, Defendant's construction adds the limitations that a compound must consist of one or more of "the same molecule" having "the same molecular structure."  (Joint Pre-Hr'g Statement (Doc. 141) at 2.)  However, this court finds that none of the circumstances that justify deviating from a term's ordinary meaning are present with respect to "compound."  Namely, this court finds that the patentees did not act as their own lexicographer with respect to

_____

[6] This court finds that any extrinsic evidence that contributed to the foregoing analysis of the "elements in definite proportions" limitation was used to aid this court's understanding of the '943 patent, and "not for the purpose of varying or contradicting the terms of the claims."  <u>See</u> <u>Markman</u>, 52 F.3d at 981.

the instant term, that the patentees did not distinguish the instant term from prior art, and that the instant term does not "so deprive[] the claim of clarity as to require resort to the other intrinsic evidence for a definite meaning." See CCS Fitness, Inc., 288 F.3d at 1366-67 (internal quotation marks and citations omitted).

Further, this court finds that the only evidence that directly supports Defendant's proposed additional limitations is highly contested extrinsic evidence that was inspired by the present litigation. (See Joint Pre-Hr'g Statement (Doc. 141) at 2-3.) See also Tex. Digital Sys., Inc., 308 F.3d at 1202-03. As such, the evidence in support of Defendant's construction is disfavored as compared to the objective dictionary definitions cited above. Vitronics Corp., 90 F.3d at 1585.

This court also notes that an expert witness for Defendant has indicated that Defendant's proposed construction of the instant term may not be entirely accurate. During his deposition in this case, Dr. Lipton confirmed that the insecticidal compound Fipronil "exists as enantiomers." (Lipton Dep. Tr. pt. 1 (Doc. 132-4) at 13.) He also stated that "two enantiomers are not the same molecule from the -- the perspective of their optical rotation and their -- and their optical properties." (Id. at 10.) It is undisputed that the '943 patent describes Fipronil as a "compound." (See Compl. Ex. C (Doc. 1-4) at 7, col. 10, ll.

18

51-52 (claiming "[a] process (A) for the preparation of a
compound having the formula (I)" (emphasis added)).) However, if
Fipronil "exists as enantiomers" and "two enantiomers are not the
same molecule" as Dr. Lipton has stated, then Fipronil does not
satisfy Defendant's proposed limitation that a compound must be
"[o]ne or more of the same molecule." Similarly, Dr. Lipton
admitted that silica oil, which is disclosed in the specification
as an embodiment of "corrosion inhibiting compound," (id. at 4,
col. 4, ll. 63-66), does not satisfy Defendant's proposed
definition of "compound," (Lipton Dep. Tr. pt. 2 (Doc. 132-5) at
25 (agreeing that silicone oil, as a "polydispersed polymer,"
"would be made up of many different compounds" under Defendant's
definition of "compound")). Thus, Dr. Lipton's testimony
undermines Defendant's proposed construction of the instant term.
See Oatey Co., 514 F.3d at 1276 ("We normally do not interpret
claim terms in a way that excludes embodiments disclosed in the
specification." (citations omitted)).

Lastly, this court observes that Defendant has cited a
definition of "compound" that, unlike Defendant's proposed
construction, includes the limitations that a compound's
molecules must consist of atoms of different elements and that
the elements cannot be separated by physical means.
Specifically, Defendant has cited the above-quoted definition of
"compound" from The American Heritage Science Dictionary: "A

substance consisting of atoms or ions of <u>two or more different</u> <u>elements</u> in definite proportions joined by chemical bonds into a molecule.  <u>The elements cannot be separated physically</u>." (<u>See</u> June 21, 2011 <u>Markman</u> Hr'g Tr. (Doc. 162) at 128.)  <u>See also</u> <u>The</u> <u>American Heritage Science Dictionary</u> 136 (emphases added).  This court finds that this dictionary definition supports this court's construction of "compound" and does not support the deviations proposed by Defendant.

For the foregoing reasons, this court concludes that "compound" should be construed as "a substance whose molecules consist of atoms of different elements.  The elements cannot be separated by physical means."

        C.    **"corrosion inhibiting compound"**

Plaintiffs propose that this claim term be construed as "A compound that inhibits (prevents, stops or decreases) corrosion resulting from, or that might be expected to result from, the claimed oxidation process."  Defendant proposes that this claim term be construed as "A hydrogen fluoride trapping agent." (Joint Pre-Hr'g Statement (Doc. 141) at 6.)

This court begins with the claim term itself and the ordinary meaning that would be attributed to these words by a person skilled in the relevant art.  <u>Tex. Digital Sys., Inc.</u>, 308 F.3d at 1201-02.  Given that this court has already construed the word "compound," this claim term appears on its face to be self-

explanatory and in need of no special construction. To the extent there is ambiguity in the word "corrosion," this court finds the following dictionary definition of "corrode" to be useful: "to eat away or diminish by acid or alkali reaction or by chemical alteration." <u>Webster's Third New International Dictionary</u> 512; <u>see also</u> <u>Tex. Digital Sys., Inc.</u>, 308 F.3d at 1203 ("[I]t is entirely proper for both trial and appellate judges to consult [dictionaries] at any stage of a litigation, regardless of whether they have been offered by a party in evidence or not."). To the extent there is ambiguity in the word "inhibit," this court finds the following dictionary definition of that word to be useful: "to retard, interfere with, or prevent (a chemical process or reaction)." <u>Webster's Third New International Dictionary</u> 1163; <u>see also</u> <u>Tex. Digital Sys., Inc.</u>, 308 F.3d at 1203.[7] Based on these dictionary definitions, this court finds that a person skilled in the relevant art would have understood "corrosion inhibiting compound" to mean "a compound that slows, interferes with, or prevents the action, process, or effect of eating away or diminishing that results from an acid or alkali reaction or a chemical alteration."

---

[7] This court finds no evidence to suggest that a person of ordinary skill in the relevant art at the time of the invention would have understood "corrode" or "inhibit" to mean anything other than their customary, dictionary meanings. Thus, these extrinsic definitions are not used "for the purpose of varying or contradicting the terms of the claims." <u>See</u> <u>Markman</u>, 52 F.3d at 981.

Reading this claim term in light of the '943 patent's specification, see Markman, 52 F.3d at 979, this court finds no reason to deviate from the term's plain meaning. Moreover, this court finds no further ambiguity in the intrinsic record as it relates to the instant term, and therefore finds that additional consultation of extrinsic evidence is unnecessary. See Vitronics Corp., 90 F.3d at 1583.

By proposing that this claim term be construed as "A hydrogen fluoride trapping agent," Defendant advocates a construction that is more specific and limited than the term's plain meaning. However, this court finds that none of the circumstances that justify deviating from a term's ordinary meaning are present with respect to "corrosion inhibiting compound." Namely, this court finds that the patentees did not act as their own lexicographer with respect to the instant term, that the patentees did not distinguish the instant term from prior art, and that the instant term does not "so deprive[] the claim of clarity as to require resort to the other intrinsic evidence for a definite meaning." See CCS Fitness, Inc., 288 F.3d at 1366-67 (internal quotation marks and citations omitted).

Defendant contends that the patentees acted as their own lexicographer by setting forth a definition of "corrosion inhibiting compound" in the '943 patent's specification that is in accordance with Defendant's proposed construction of the

instant term. Specifically, Defendant argues that the following specification language serves to define "corrosion inhibiting compound" for purposes of the '943 patent: "The corrosion inhibiting compound is <u>generally</u> boric acid or an alkali metal borate such as sodium borate; or any hydrogen fluoride trapping agent such as silica (silicon dioxide), optionally in the form of silica oil." (<u>See</u> Compl. Ex. C (Doc. 1-4) at 4, col. 4, ll. 63-66 (emphasis added).) However, this court finds that the foregoing language does not clearly redefine the instant term "so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." <u>See</u> <u>Bell Atl.</u> <u>Network Servs., Inc.</u>, 262 F.3d at 1268. Especially given that the specification language lists several acceptable "corrosion inhibiting compounds" and that the list is preceded by the word "generally," this court finds that the specification language cited by Defendant merely sets forth an embodiment of the invention and that the language of the actual claim is broader than that embodiment. Thus, this court declines to read Defendant's proposed limitation into the claim language. <u>See</u> <u>Electro Med. Sys., S.A.</u>, 34 F.3d at 1054 ("[C]laims are not to be interpreted by adding limitations appearing only in the specification. . . . [P]articular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." (citations omitted)).

For the foregoing reasons, this court concludes that "corrosion inhibiting compound" should be construed as "a compound that slows, interferes with, or prevents the action, process, or effect of eating away or diminishing that results from an acid or alkali reaction or a chemical alteration."

## IV. CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that the meaning and scope of the patent claim terms presented by the parties for construction are determined as follows:

A. "in the presence of" is construed as "in the same place as, in the vicinity of, or in the area immediately near";

B. "compound" is construed as "a substance whose molecules consist of atoms of different elements. The elements cannot be separated by physical means";

C. "corrosion inhibiting compound" is construed as "a compound that slows, interferes with, or prevents the action, process, or effect of eating away or diminishing that results from an acid or alkali reaction or a chemical alteration."

This the 9th day of August 2011.

William L. Osteen, Jr.
United States District Judge